# UNITED STATES DISTRICT COURT
## DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Leon Kuchenmeister, Cindy A. Hugger-Gravitt, and Beth A. Bretoi, individually and on behalf of all those similarly situated,<br><br>         Plaintiffs,<br><br>    v.<br><br>HEALTHPORT TECHNOLOGIES, LLC, IOD INCORPORATED, AND CIOX HEALTH, LLC INDIVIDUALLY AND D/B/A IOD INCORPORATED AND HEALTHPORT TECHNOLOGIES, LLC.<br>         Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

## I. INTRODUCTION

1.      Every day in the United States of America, individuals request copies of their electronically stored personal health information ("PHI") in electronic format from their hospitals, clinics, and other medical facilities. Plaintiffs are three such people who personally requested copies of their electronically stored PHI from one of their medical facilities.

2.      Defendants, the largest provider of release of information ("ROI") services, partners with thousands of hospitals, health systems, physician practices and clinics, including the Plaintiffs' medical providers, to process and fulfill

1

medical record requests, and maintaining compliance related to releasing medical information to all types of requesters like the Plaintiffs.

3.      When an individual requests his/her protected electronically stored PHI from a hospital, physician or group practice that Defendants have been engaged for their services, Defendants digitally capture the PHI from the medical facility's electronic or paper medical record through a confidential and secure technology platform.  Thereafter, the PHI is digitally transferred for processing where it is packaged and mailed or electronically sent in a HIPPA-compliant format to the patient/requester.

4.      Because Defendants provide the service to process and fulfill patient medical record requests on behalf of an engaged hospital, physician or group practice, Defendants charge the requesting patient a fee associated with this service.

5.      By charging individuals unreasonable fees associated with their service for the process and fulfillment of an individual's request for his/her medical records, Defendants have caused consumers actual monetary harm for out of pocket costs and expenses.

6.      Plaintiffs, on behalf of themselves and the proposed classes of similarly situated individuals described below, bring this suit under Georgia law,

federal law and regulations governing medical records request, production, and associated fees.  Defendants continue to unreasonably bill individuals when they request copies of their electronically stored PHI in electronic format.  On behalf of the class, Plaintiffs seek an injunction requiring Defendants to cease all unlawful and unreasonable billing and an award damages to the class members, together with costs and reasonable attorney's fees.  All allegations contained herein are based upon information and belief of Plaintiffs or the investigative efforts of the undersigned counsel.

## II. JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d) and diversity of citizenship under 28 U.S.C. §1332(a). Plaintiffs allege, upon information and belief, that there are thousands of Class members and that the aggregated amount in controversy for Plaintiffs and the Classes exceeds five million dollars ($5,000,000.00) exclusive of costs and interest.  In addition, the Court has jurisdiction over this class action lawsuit under 28 U.S.C. § 1332(d)(2).

8.     Venue in this District is proper under 28 U.S.C. § 1391(b), (c) and (d), because Defendants provide services to individuals in this District and throughout the country in the form of paper and electronic copies of PHI.  Furthermore,

Defendants bill consumers in this District for those services, have contracts with hospitals, physicians and group practices in this District, and mail electronically stored PHI to consumers/patients within this District.

### III. INTERESTED PARTIES

9.      Plaintiff, Leon Kuchenmeister (hereinafter, "Plaintiff Kuchenmeister" or "Mr. Kuchenmeister"), is a natural person, and citizen of the State of Minnesota, residing in Ramsey County, Minnesota, and a personal requester of his medical information known as PHI.

10.      Plaintiff, Cindy A. Hugger-Gravitt (hereinafter, "Plaintiff Gravitt" or "Mrs. Gravitt"), is a natural person, and citizen of the State of Minnesota, residing in Anoka County, Minnesota, and a personal requester of her medical information known as PHI.

11.      Plaintiff, Beth A. Bretoi (hereinafter, "Plaintiff Bretoi" or "Ms. Bretoi"), is a natural person, a citizen of the State of Minnesota, residing in Ramsey County, Minnesota, and a personal requester of her medical information known as PHI.

12.      Defendant HealthPort Technologies, LLC ("HealthPort"), at all times material, was a for-profit limited liability company operating throughout the United States and providing release of information (ROI) services, audit

4

management and tracking technologies to hospitals, health systems, physician practices and clinics for the purpose of processing and fulfilling medical record requests as well as maintaining compliance related to the releasing of medical information to all types of requesters throughout the United States. Defendant HealthPort has since changed its name to CIOX Health, LLC with its principal place of business located in Alpharetta, Georgia.

13.     Defendant IOD Incorporated, at all times material, was a foreign business corporation operating throughout the United States and providing release of information (ROI) services, audit management and tracking technologies to hospitals, health systems, physician practices and clinics for the purpose of processing and fulfilling medical record requests as well as maintaining compliance related to the releasing of medical information to all types of requesters throughout the United States. Defendant IOD Incorporated has since changed its name to CIOX Health, LLC.

14.     On or about July 1, 2015, Defendant HealthPort merged with Defendant IOD to form HealthPort-IOD. On or around March 1, 2016, HealthPort-IOD changed its name to CIOX Health, LLC. Despite this merger and name change, Defendant CIOX Health, LLC continues to operate and provide

services as Defendant HealthPort and Defendant IOD, as well as Defendant CIOX Health, LLC throughout the United States, including this District.

15.     Now conducting business as CIOX Health, LLC, a Georgia Domestic Limited Liability Company, with locations in all 50 states of the United States, Defendants are the single largest access point for meaningful health information in the country. They are embedded at more provider sites across the country — the majority of the U.S. delivery system — as their release of information partner. In addition, they connect numerous provider sites through their field technicians and technology platform for record retrieval. This makes them uniquely positioned to bring consent-driven access to health information to all those who need it — regardless of location, EMR, or health system affiliation. This position places superiority and influence with consumers as to production of a consumers request for electronic PHI. *See* Exhibit A at 4 attached hereto.

16.     Defendant CIOX Health, LLC's footprint consists of over 50 million requests for health information reliability handled annually, 75,000 hospital and provider record retrieval sites connected, 7,500 HIM professionals and record release experts who deliver service, accuracy, and quick response times, 100 health plans serviced, 1 million unique requesters who need access to protected health

information, 18,000 hospital and provider sites serviced, and 400 EMR (electronic medical record) systems for record access. *Id.*

## IV. A BRIEF OVERVIEW OF HIPPA AND HITECH ACTS

17.    Information is essential fuel for the engine of health care. Physicians, medical professionals, hospitals and other clinical institutions generate, use and share it to provide quality care to individuals, to evaluate the quality of care they are providing, and to assure they receive proper payment from health plans. Health plans generate, use and share it to pay for care, to assure care for their members is well coordinated and that populations of individuals with chronic conditions are receiving appropriate care. The capability for relevant players in the health care system – including the patient – to be able to quickly and easily access needed information to make decisions, and to provide the right care at the right time, is fundamental to achieving the goals of health reform. *See* http://www.hhs.gov/hipaa/for-professionals/privacy/guidance/permitted-uses/index.html (Last accessed on January 31, 2017).

18.    The Privacy, Security, and Breach Notification Rules under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) were intended to support information sharing by providing assurance to the public that sensitive health data would be maintained securely and shared only for appropriate purposes

or with express authorization of the individual. For more than a decade, the HIPAA regulations have provided a strong privacy and security foundation for the health care system. *Id.*

19.    To improve the efficiency and effectiveness of the health care system, HIPPA included Administrative Simplification provisions that required the Department of Health and Human Services ("HHS") to adopt national standards for electronic health care transactions and code sets, unique health identifiers, and security. At the same time, Congress recognized that advances in electronic technology could erode the privacy of health information. Consequently, Congress incorporated into HIPAA provisions mandated adoption of Federal privacy protections for individually identifiable health information. *Id.*

20.    To the extent there was a conflict between state and federal laws concerning an individual's right of electronic access to PHI, HIPAA's electronic right of access requirements preempt the contrary State law unless such law is more stringent. *See* https://www.gpo.gov/fdsys/pkg/FR-2013-01-25/pdf/FR-2013-01-25.pdf at p. 5632 (Last accessed on January 31, 2017).

21.    On March 26, 2013, the U.S. Department of Health and Human Services (HHS) strengthened the privacy and security protections for health information established under HIPAA by enhancing a patient's privacy

protections, providing individual's new rights to their health information, and strengthening the government's ability to enforce the law. *Id.* at 5566 (SUMMARY).

22.     In implementing the changes to HIPPA, covered entities and business associates had to comply with the applicable requirement by September 23, 2013. *Id.*

23.     Covered entities included the health care provider, health plans, and healthcare clearinghouses.  *See* generally 45 C.F.R. § 160.103 (definition of "covered entity").

24.     Most health care providers and health plans did not, and continuously do not, carry out all of their health care activities and functions by themselves. As a result, they have often used the services of a variety of other persons or businesses, known as "business associates."  *See* http://www.hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/index.html     (Last accessed on January 31, 2017).

25.  HIPPA allows covered providers and health plans to disclose protected health information to these "business associates" if the providers or plans obtain satisfactory assurances that their business associates will use the information only for the purposes for which it was engaged by the covered entity,

will safeguard the information from misuse, and will help the covered entity comply with some of the covered entity's duties under the Privacy Rule, which is generally done by contract or other agreement. *Id.*

26.    A "business associate" is therefore a person or entity that performs certain functions or activities that involve the use or disclosure of PHI on behalf of, or provides services to, a covered entity. *Id*, *See also* 45 C.F.R. § 160.103 (definition of "business associate").

27.    HIPPA generally requires that covered entities enter into contracts with their business associates to ensure that their business associates will appropriately safeguard PHI.  The business associate contract also serves to clarify and limit, as appropriate, the permissible uses and disclosures of protected health information by the business associate, based on the relationship between the parties and the activities or services being performed by the business associate.  A business associate may use or disclose protected health information only as permitted or required by its business associate contract or as required by law. *See* https://www.gpo.gov/fdsys/pkg/FR-2013-01-25/pdf/FR-2013-01-25.pdf at p. 5632 (Last accessed on January 31, 2017).

28.    In addition to HIPPA, The Health Information Technology for Economic and Clinical Health Act ("HITECH") was enacted under Title XIII of

the American Recovery and Reinvestment Act of 2009 to promote the widespread adoption of electronic health records ("EHR") and interoperability of health information technology. *See* https://www.hhs.gov/hipaa/for-professionals/special-topics/HITECH-act-enforcement-interim-final-rule/index.html?language=es (Last accessed on January 31, 2017).

29.     Modifications to the HIPAA Privacy, Security, and Enforcement Rules were made thereafter to implement many of the privacy, security, and enforcement provisions of the HITECH Act. *See* https://www.gpo.gov/fdsys/pkg/FR-2013-01-25/pdf/FR-2013-01-25.pdf at p. 5570 (Last accessed on January 31, 2017).

30.     A covered entity's contract or other written arrangement with its business associate must contain the elements specified at 45 CFR 164.504(e) which describes business associate contracts. *See* 45 CFR 164.504(e)(2); *See also* 42 U.S.C. § 17938 (Business associate contracts required for certain entities).

31.     In relevant part, 45 CFR 164.504(e)(2) mandates that a contract between the covered entity and a business associate provide that a business associate will make available PHI in accordance with § 164.524. *See* 45 CFR 164.504(e)(2)(ii)(E); 42 U.S.C. § 17938.

11

32.    HHS has further provided a sample contract that is acceptable to use between a covered entity and business associate, which illustrates the contract between the covered entity and the business associate needing a clause providing that a business associate will make available PHI in a designated record set to the individual or the individual's designee as necessary to satisfy covered entity's obligations under 45 CFR 164.524.    *See* http://www.hhs.gov/hipaa/for-professionals/covered-entities/sample-business-associate-agreement-provisions/index.html (Last accessed on January 31, 2017).

33.    Under 45 CFR 164.524, an individual has a right of access to inspect and obtain a copy of PHI about the individual in a designated record set, for as long as the PHI is maintained in the designated record set.  *See also* 42 U.S.C. § 17935(e)(1).

34.    The right of an individual to have PHI sent directly to a third party is an extension of the individual's right of access; consequently, all of the provisions that apply when an individual obtains access to her PHI apply when she directs a covered entity to send the PHI to a third party.  *See* 45 CFR 164.524(c)(3)(ii); 42 U.S.C § 17935(e)(1).

35.    The covered entity must permit an individual to request access to inspect or to obtain a copy of the PHI about the individual that is maintained in

12

a designated record set. The covered entity may require individuals to make requests for access in writing, provided that it informs individuals of such a requirement. *See* 45 CFR 164.524(b)(1).

36.    The covered entity must act on a request for access no later than 30 days after receipt. *See* 45 CFR 164.524(b)(2).

37.    If the covered entity provides an individual with access, in whole or in part, to PHI, the covered entity must provide the individual with access to the PHI in the form and format requested by the individual, which includes in electronic format. *See* 45 CFR 164.524(c)(2)(i); 42 U.S.C. § 17935(e)(1).

38.    In general, if the PHI that is the subject of a request for access is maintained in one or more designated record sets electronically and if the individual requests an electronic copy of such information, the covered entity ***must*** provide the individual with access to the PHI in the electronic form and format requested by the individual. *See* 45 CFR 164.524(c)(2)(ii) (emphasis added); 42 U.S.C. § 17935(e)(1).

39.    If the individual requests a copy of the PHI, the covered entity may impose a reasonable, cost-based fee, provided that the fee includes only the cost of labor for copying the PHI requested by the individual, supplies for creating electronic media if the individual requests that the electronic copy be provided on

portable media; postage when the individual has requested the copy be mailed. *See* 45 CFR 164.524(c)(4)(i-iv).

40.    On March 1, 2016, HHS issued "access guidance" for professionals, including covered entities and business associates, which specifically clarified what a reasonable cost based fee could be assessed when an individual requested his electronically stored PHI be produced in electronic format. *See* http://www.hhs.gov/hipaa/for-professionals/privacy/guidance/access/index.html (Last accessed on January 31, 2017).

41.    Regarding fees for copies, HHS advised that the HIPPA's Privacy Rule permits a covered entity to impose a reasonable, cost-based fee if the individual requests a copy of the PHI. The fee may include only the cost of: (1) labor for copying the PHI requested by the individual, whether in paper or electronic form; (2) supplies for creating the paper copy or electronic media (e.g., CD or USB drive) if the individual requests that the electronic copy be provided on portable media; (3) postage, when the individual requests that the copy, or the summary or explanation, be mailed; and (4) preparation of an explanation or summary of the PHI, if agreed to by the individual. *See* 45 CFR 164.524(c)(4). The fee may not include costs associated with verification; documentation; searching for and retrieving the PHI; maintaining systems; recouping capital for

data access, storage, or infrastructure; or other costs not listed above <u>even if such</u> <u>costs are authorized by State law</u>. *See* Exhibit B at 11 attached hereto.

42.    HHS clarified that labor for copying <u>includes only</u> labor for creating and delivering the electronic or paper copy in the form and format requested or agreed upon by the individual, once the PHI that is responsive to the request has been identified, retrieved or collected, compiled and/or collated, and is ready to be copied.  For example, labor for copying may include labor associated with the following, as necessary to copy and deliver the PHI in the form and format and manner requested or agreed to by the individual:

- Photocopying paper PHI.

- Scanning paper PHI into an electronic format.

- Converting electronic information in one format to the format requested by or agreed to by the individual.

- Transferring (*e.g.*, uploading, downloading, attaching, burning) electronic PHI from a covered entity's system to a web-based portal (where the PHI is not already maintained in or accessible through the portal), portable media, e-mail, app, personal health record, or other manner of delivery of the PHI.

- Creating and executing a mailing or e-mail with the responsive PHI.

*Id.* at 19-20.

43.    To calculate the reasonable fee to be charged, HHS provided three methods that would be acceptable under HIPPA privacy rules. *Id.* at 22-3.

44.    Actual costs. A covered entity may calculate actual labor costs to fulfill the request, as long as the labor included is only for copying and the labor rates used are reasonable for such activity. The covered entity may add to the actual labor costs any applicable supply (e.g., paper, or CD or USB drive) or postage costs. Covered entities that charge individuals actual costs based on each individual access request still must be prepared to inform individuals in advance of the approximate fee that may be charged for providing the individual with a copy of her PHI. *Id.* at 23.

45.    Per HHS, an example of an actual labor cost calculation would be to time how long it takes for the workforce member of the covered entity (or business associate) to make and send the copy in the form, format, and manner requested or agreed to by the individual and multiply the time by the reasonable hourly rate of the person copying and sending the PHI. *Id.*

46.    Average costs. In lieu of calculating labor costs individually for each request, a covered entity can develop a schedule of costs for labor based on average labor costs to fulfill standard types of access requests, as long as the types

of labor costs included are the ones which the Privacy Rule permits to be included in a fee (e.g., labor costs for copying <u>but not</u> for search and retrieval) and are reasonable. Covered entities may add to that amount any applicable supply (e.g., paper, or CD or USB drive) or postage costs. *Id.* at 24-5.

47.    HHS has made it clear this average cost can be calculated and charged as a per page fee <u>only</u> in cases where the PHI requested is maintained in paper form and the individual requests a paper copy of the PHI or asks that the paper PHI be scanned into an electronic format. Per page fees are <u>not</u> permitted for paper or electronic copies of PHI <u>maintained electronically</u>. *Id.* (emphasis added).

48.    Furthermore, HHS confirmed charging per page fees for copies of PHI maintained electronically was not reasonable for purposes of 45 CFR 164.524(c)(4). *Id.* at 24.

49.    <u>Flat fee for electronic copies of PHI maintained electronically</u>.  A covered entity that does not want to go through the process of calculating actual or average allowable costs for requests for electronic copies of PHI maintained electronically, may charge individuals a flat fee for all requests for electronic copies of PHI maintained electronically, provided the fee does not exceed $6.50, inclusive of all labor, supplies, and any applicable postage.  *Id*.

50.    $6.50 is not the maximum amount that can be charged to provide individuals with a copy of their PHI, if a covered entity (or business associate operating on its behalf) wants to calculate the allowable fees for providing individuals with copies of their PHI: (1) by calculating actual allowable costs to fulfill each request; or (2) by using a schedule of costs based on average allowable labor costs to fulfill standard requests.  Still, an entity that chooses to calculate actual costs or average costs must inform the individual in advance of the approximate fee that may be charged for providing the copy requested. *Id.* at 25.

51.    Costs authorized by State fee schedules permitted to be charged to individuals when providing them with a copy of their PHI are not authorized under the HIPAA Privacy Rule except in cases where the State authorized costs are the same types of costs permitted under 45 CFR 164.524(c)(4) of the HIPAA Privacy Rule, and are reasonable. *Id.*

## V. FACTUAL ALLEGATIONS SPECIFIC TO MR. KUCHENMEISTER

52.    On or about July 27, 2016, Plaintiff Kuchenmeister requested a copy of his PHI from his medical provider, Health Partners Clinics.  *See* Exhibit C attached hereto.

53.    In that request, Plaintiff Kuchenmeister requested copies of any and all of his medical records this medical provider had, including, but not limited to

nursing, radiological films, intake forms, medical treatment, treatment referrals, billing records, and outside records from all of the providers' facilities.

54.    Plaintiff further requested that the records be provided in electronic form and on CD in the Adobe Acrobat .pdf format.

55.    Plaintiff requested that his records be sent to a third party.

56.    Plaintiff further requested that if there was a charge to get his records, the bill be sent to him at his address.

57.    Thereafter, Plaintiff's medical provider, Health Partners Clinics received his request for an electronic copy of his PHI.

58.    At all times material, Health Partners Clinics, via themselves and/or Defendants, maintained Plaintiff Kuchenmeister's PHI in electronic format. *See* https://www.healthpartners.com/hp/about/quick-facts/ (Last accessed on January 31, 2017).

59.    Because Health Partners Clinics was contracted, via a contract with Defendants to fulfill individual requests for electronic copies of his PHI, Plaintiff Kuchenmeister's request for his PHI was forwarded to Defendants for processing and completion.

60.    By virtue of this contract between Plaintiff Kuchenmeister's medical provider and Defendants, Defendants where "business associates" to Plaintiff Kuchenmeister's medical providers and authorized to access his PHI.

61.    The subject of this contract was the access and production of Plaintiff Kuchenmeister's PHI, as well as other patients, to lawfully access his PHI when requested under HIPPA laws.

62.    By virtue of this contract, Defendants were bound to produce a copy of Plaintiff Kuchenmeister's PHI subjected to the requirements of 45 CFR 164.524. *See* Exhibit D attached hereto (Sample contract Defendants use with covered entities.)

63.    On or about August 9, 2016, Defendants copied to cd, 1 .pdf file containing 221 pages of Plaintiff Kuchenmeister's medical records from HealthPartners/Regions Hospital.

64.    That prior to copying these records, Plaintiff Kuchenmeister's PHI with this medical provider was maintained in electronic format and did not need to be scanned in from paper copies.

65.    On or about August 10, 2016, Defendants mailed to Plaintiff Kuchenmeister's designated third party the cd as outlined above, which contained his PHI from HealthPartners/Regions Hospital.

66.    That along with that mailed cd, Defendants included a "How to Access files on Encrypted Disc", which informed that if there was a problem with the file, contact Defendant CIOX with the reference number on the disc.

67.    Within the above letter, Defendants informed it was their policy to mail a separate letter with a password to access the encrypted file of Plaintiff Kuchenmeister's PHI.

68.    That on or about August 9, 2016, Defendants mailed Plaintiff Kuchenmeister's designated third party the letter containing the password for the encrypted file of Plaintiff Kuchenmeister's PHI.

69.    Within this letter, Defendants informed that if there was a problem with the file, Defendant HealthPort was to be contacted.

70.    After mailing Plaintiff Kuchenmeister's PHI as requested by Plaintiff Kuchenmeister, Defendants created in their name an invoice that they mailed to Plaintiff Kuchenmeister on or around August 11, 2016, invoice number 0198348803.  *See* Exhibit C.

71.    The invoice asked Plaintiff Kuchenmeister to pay $78.12 (USD) with a net term of 30 days.

72.    The invoice outlined a per page copy (paper) 1, quantity 175, unit price of $0.36, for a total of $63.00.

21

73.    The invoice charged $9.92 for shipping and $5.20 for sales tax.

74.    The invoice did not inform Plaintiff Kuchenmeister that the at-issue records were not maintained in a format other than electronic.

75.    The invoice did not calculate actual labor costs to fulfill Plaintiff Kuchenmeister's request.

76.    The invoice did not outline the supply costs of the cd.

77.    The invoice did outline a charge of $5.50 for postage, however the actual envelope that accompanied the at-issue cd contains a postage mark of $1.15.

78.    The charging of more postage than was actually incurred was not reasonable and in direct violation of 45 CFR 164.524(c)(4).

79.    If Defendants were attempting to charge Plaintiff Kuchenmeister actual costs for the production of his PHI, and given the invoice was mailed after the cd was mailed, Defendants did not inform Plaintiff Kuchenmeister in advance of the actual or approximate fee that may be charged for providing him with a copy of his PHI in electronic format, including, but not limited to hourly rates, scanning rates for those pages not maintained in electronic format, as well as postage fees associated with shipping.

80.    The invoice did not outline any actual labor charges for copying Plaintiff Kuchenmeister's electronically stored PHI to cd.

81.    The invoice did not outline any average costs in lieu of calculating labor costs individually.

82.    The invoice did charge a per page copy fee for $63.00.

83.    HHS made clear March 1, 2016, per page fees are not permitted for electronic copies of PHI that are maintained electronically and thus are unreasonable charges.

84.    Defendants knew charging a per page fee was unreasonable as early as 2013, based on HHS investigation and written opinion when they and a covered entity were the subject of unreasonable billing practices. *See* Exhibit E and Exhibit F attached hereto.

85.    As a result, Defendants per page charge of $63.00 was unreasonable and in direct violation of 45 CFR 164.524(c)(4).

86.    Defendants knew or should have known their billing practice of charging more than $6.50 for electronically stored medical records produced in electronic format was unreasonable and in violation of 45 CFR 164.524(c)(4).

87.    Because Defendants did not want to go through the process of calculating actual or average allowable costs for Plaintiff Kuchenmeister's requests for electronic copies of his PHI maintained electronically, Defendants had the

option of charging a flat fee to Plaintiff Kuchenmeister in the amount of $6.50, inclusive of labor, supplies, and any applicable postage.

88.    Defendants chose to ignore HHS' "access guidance" and instead charged Plaintiff Kuchenmeister unreasonable costs and expenses for his request for electronic copies of his PHI maintained electronically when it charged him $78.12.

89.    Since Defendants chose to forgo calculating their actual charges and average charges, and failed to inform him in advance of producing his PHI of any associated charges to copy his PHI to electronic format, the most Defendants could reasonably charge Plaintiff Kuchenmeister for his electronic copy of his PHI was $6.50.

90.    That Defendants were obligated to only charge this amount based on 45 CFR 164.524(c)(4) and the "business associate" contract they had with Plaintiff Kuchenmeister's medical provider(s).

91.    That any and all state laws that may provide Defendants an ability to charge Plaintiff Kuchenmeister in excess of $6.50 were pre-empted by HIPPA and HITECH.

92.     On or about September 30, 2016, Plaintiff Kuchenmeister wrote a check, number 2951, to Defendants in the amount of $78.12, in payment of Defendants' invoice 0198348803.

93.     In the memo line of check 2951, Plaintiff Kuchenmeister informed he was paying under protest.

94.     Mailed along with his check 2951, Plaintiff Kuchenmeister included a copy of Defendants' invoice where he again informed he was paying under protest and that he disputed the amount owed.

95.     Plaintiff Kuchenmeister payed Defendants' invoice to avoid collection attempts for failure to pay the at-issue invoice.

96.     Defendants cashed Plaintiff Kuchenmeister's check on or about October 4, 2016.

97.     On February 13, 2017, Plaintiff Kuchenmeister sent a letter to Defendant HealthPort demanding a refund for the amount he was overcharged, and to refund everyone else that was overcharged.

98.     Defendants have not refunded Plaintiff Kuchenmeister any money paid by him to date for the charges that exceeded $6.50.

## VI. FACTUAL ALLEGATIONS SPECIFIC TO MRS. GRAVITT

99.    On or about June 6, 2016, Plaintiff Gravitt requested a copy of her PHI from her medical provider, HealthEast Hospitals and Clinics. *See* Exhibit G attached hereto.

100.    In that request, Plaintiff Gravitt requested copies of any and all of her medical records this medical provider had, including, but not limited to Hugo Clinic, Vadnais Heights Clinic, St. Paul Surgeons, St. John's Hospital and St. Joseph's Hospital.

101.    Plaintiff Gravitt further requested that the records be provided in electronic form and on CD in the Adobe Acrobat .pdf format.

102.    Plaintiff Gravitt requested that her records be sent to a third party.

103.    Plaintiff Gravitt further provided via letter a copy of HHS' explanation regarding her ability to obtain the requested PHI in the format requested.

104.    Thereafter, Plaintiff Gravitt's medical provider, HealthEast Hospital and Clinics received Plaintiff Gravitt's request for an electronic copy of her PHI on or about June 22, 2016.

105.   HealthEast Hospital and Clinics, via themselves and/or Defendants, maintained Plaintiff Gravitt's PHI in electronic format prior to this request from Plaintiff Gravitt.

106.   Because HealthEast Hospital and Clinics was contracted, via a contract, with Defendants to fulfill individual requests for electronic copies of her PHI, Plaintiff Gravitt's request for her PHI was forwarded to Defendants for processing and completion.  *See* Exhibit H.

107.   By virtue of this contract between Plaintiff Gravitt's medical provider and Defendants, Defendants where "business associates" to Plaintiff Gravitt's medical providers and authorized to access Plaintiff Gravitt's PHI.

108.   The subject of this contract was the access and production of Plaintiff Gravitt's PHI, as well as other patients, to lawfully access her PHI when requested under HIPPA laws.

109.   By virtue of this contract, Defendants were bound to produce a copy of Plaintiff Gravitt's PHI subjected to the requirements of 45 CFR 164.524.

110.   On or about June 27, 2016, Defendants copied to paper 53 pages of Plaintiff Gravitt's medical records from HealthEast clinics, thereafter mailing them in paper format to Plaintiff Gravitt's designated individual.

111.   That prior to copying these records, Plaintiff Gravitt's PHI with this medical provider was maintained in electronic format and did not need to be copied to paper format.

112.   By virtue of their contract with Plaintiff Gravitt's medical provider, Defendants had access to Plaintiff Gravitt's PHI that was electronically stored prior to the production of those records.

113.   Plaintiff Gravitt clearly requested in her June 2, 2016, letter that all records requested be produced in electronic format, on cd, and in .pdf format.

114.   By providing a paper copy of Plaintiff Gravitt's electronically stored PHI, Defendants' did not provide Plaintiff Gravitt with her PHI in the form or format requested in direct violation of 45 CFR 164.524 § (c)(2)(ii).

115.   Prior to fulfilling and sending Plaintiff Gravitt's request for PHI, Defendants did not contact Plaintiff Gravitt to inform her PHI was not maintained in electronic format.

116.   Prior to fulfilling and sending Plaintiff Gravitt's request for her PHI, Defendants did not contact Plaintiff Gravitt and inform her that there would be additional charges to produce her PHI in electronic format.

117.   After mailing Plaintiff Gravitt's PHI as requested by Plaintiff Gravitt, Defendants created in their name an invoice that they mailed to Plaintiff Gravitt on or around June 28, 2016, invoice number 0195485022.  *See* Exhibit H.

118.   The invoice requested payment, listed a term of net 30 days, and to email questions to collections@healthport.com.

119.   Despite the records request being a request directly from Plaintiff Gravitt, Defendants' invoice asked Plaintiff Gravitt's designated third party to issue payment in the amount of $97.71 (USD) with a net term of 30 days.

120.   The invoice outlined a per page copy (paper) 1, quantity 53, unit price of $1.33, for a total of $70.49.

121.   The invoice requested a basic retrieval fee of $17.68, shipping of $3.04, and sales tax of $6.50.

122.   The invoice was not produced to Plaintiff Gravitt prior to shipping of Plaintiff Gravitt's at-issue PHI in paper format.

123.   Because Plaintiff Gravitt attached to her request, HHS' "Individual Rights under HIPPA to Access their Health Information," Defendants' knew ahead of producing Plaintiff Gravitt's requested PHI of the following:

     a.   Defendants had to produce Plaintiff Gravitt's PHI in the form and format requested.

     b.  If unavailable in the form or format requested, Defendants had to inform Plaintiff Gravitt prior to the production of the costs and expenses associated to produce in the form or format requested.

     c.  HHS had determined the failure to inform a requester in advance of production of PHI that the PHI was unavailable in the form or format requested was an unreasonable measure.

     d.  When requested and available in electronic format, the most that Defendants could charge was $6.50, inclusive of all labor, supplies, and any applicable postage unless actual labor was itemized out or average costs were determined and provided in advance of production.

*See* Exhibit H.

124.  Furthermore, Defendants knew charging a per page fee was unreasonable as early as 2013, based on HHS investigation and written opinion when they and a covered entity were the subject of unreasonable billing practices. *See* Exhibits E and F.

125.  Defendants did not inform the Plaintiff Gravitt prior to the production of her PHI that the records were not available in electronic format or that there would be additional charges incurred to receive the requested information in this format.

126.   The invoice did not inform Plaintiff Gravitt that the at-issue records were not maintained in electronic format.

127.   The invoice did not calculate actual labor costs to fulfill Plaintiff Gravitt's request.

128.   The invoice did not outline any average costs in lieu of calculating actual labor costs individually.

129.   Defendants never contacted the Plaintiff Gravitt prior to the production of her requested PHI to inform her there was actual or average labor costs associated with the production of her PHI requested.

130.   HHS has made clear March 1, 2016, per page fees were not permitted for electronic copies of PHI that are maintained electronically when that information is requested be produced in electronic format.

131.   Defendants knew or should have known their billing practice of charging more than $6.50 for electronically stored medical records produced in electronic format was unreasonable and in violation of 45 CFR 164.524(c)(4).

132.   As a result, Defendants production of Plaintiff Gravitt's PHI via paper was unreasonable and in direct violation of 45 CFR 164.524, when she requested they be produced in electronic form and on cd.

133.   Because Defendants did not go through the process of calculating actual or average allowable costs for Plaintiff Gravitt's requests for electronic copies of her PHI maintained electronically, and since Plaintiff Gravitt personally requested her PHI be produced in electronic format, Defendants could only charge a flat fee to Plaintiff Gravitt in the amount not to exceed $6.50, inclusive of labor, supplies, and any applicable postage.

134.   Defendants chose to ignore HHS' "access guidance" and Plaintiff Gravitt's request for PHI in the form and format she requested, charged Plaintiff Gravitt unreasonable costs and expenses for her request for electronic copies of her PHI maintained electronically, and charged her $97.71.

135.   Since Defendants chose to forgo calculating their actual charges and average charges, and chose to produce Plaintiff Gravitt's records in paper format despite her request for electronic format, the most Defendants could reasonably charge Plaintiff Gravitt for the copy of her PHI that had been maintained electronically was $6.50.

136.   Defendants were obligated to only charge this amount based on 45 CFR 164.524(c)(4) and the "business associate" contract they had with Plaintiff Gravitt's medical provider(s).

137.   On July 11, 2016, Plaintiff Gravitt had her personal attorneys respond to Defendants' unreasonable and unlawful invoice 0195485022 via letter. *See* Exhibit H.

138.   In this correspondence, Defendants were informed of their unreasonable and illegal attempts to charge Plaintiff Gravitt for copies of her electronically stored PHI.

139.   Defendants were again provided a copy of the HHS' publication of "Individuals' Right under HIPPA to Access their Health Information 45 CFR § 164.524."

140.   On behalf of Plaintiff Gravitt, payment was issued to Defendants in the amount of $6.50 for invoice 0195485022.

141.   Defendants received this check and cashed it.  Thereafter, Defendants reaffirmed their unlawful billing practice when they submitted an additional bill for the remainder amount of invoice 0195485022 in the amount of $91.21.

142.   Defendants continued their deceitful practice by invoicing the alleged unpaid balance of $91.21 into September 2016.

143.   By sending a follow up invoice, crediting only the $6.50, Defendants re-affirmed its demand for unreasonable full payment in the amount of $97.71, an amount it was not entitled to.

144.   As a result of Defendants refusal to accept $6.50 for the copy of her PHI, on October 4, 2016, based on Defendants continued billing practices and because Plaintiff Gravitt requested a copy of her PHI, she wrote a check, number 11935, to Defendants in the amount of $91.21, in payment of Defendants' invoice 0195485022.

145.   In the memo line of check 11935, Plaintiff Gravitt informed she was "Paying this bill under Protest."

146.   Plaintiff Gravitt payed Defendants' invoice to avoid collection attempts for failure to pay the at-issue invoice as those are threats that Defendants typically make to consumers and the class members when an invoice goes unpaid. *See* Exhibit I attached hereto.

147.   Defendants cashed Plaintiff Gravitt's check on or about October 8, 2016.

148.   On February 14, 2017, Plaintiff Gravitt sent a letter to Defendant HealthPort demanding a refund for the amount she was overcharged, and to refund everyone else that was overcharged.

149.   Defendants have not refunded Plaintiff Gravitt any money paid by her to date for the charges that exceeded $6.50.

## VII. FACTUAL ALLEGATIONS SPECIFIC TO MS. BRETOI

150.   On or about February 26, 2016, Plaintiff Bretoi requested a copy of her PHI from her medical provider, Allina Health.  *See* Exhibit J attached hereto.

151.   Defendants received this letter on or about March 8, 2016.

152.   In that request, Plaintiff Bretoi had requested copies of any and all of her medical records.

153.   Plaintiff Bretoi requested that the records be provided in electronic form and on CD in the Adobe Acrobat .pdf format.

154.   Plaintiff Bretoi requested that her records be sent to a third party.

155.   Plaintiff Bretoi further provided via letter a copy of HHS' explanation regarding her ability to obtain the requested PHI in the format requested.

156.   Allina Health, via themselves and/or Defendants, maintained Plaintiff Bretoi's PHI in electronic format prior to this request from Plaintiff Bretoi.  *See* http://www.allinahealth.org/Customer-Service/Medical-records/ (Last accessed on January 31, 2017).

157.   Because Allina Health was contracted, via a contract, with Defendants to fulfill individual requests for electronic copies of her PHI, Plaintiff Bretoi's request for her PHI was forwarded to Defendants for processing and completion.

158.   By virtue of this contact between Plaintiff Bretoi's medical provider and Defendants, Defendants where "business associates" to Plaintiff Bretoi's medical providers and authorized to access Plaintiff Bretoi's PHI.

159.   The subject of this contract was the access and production of Plaintiff Bretoi's PHI, as well as other patients, to lawfully access her PHI when requested under HIPPA laws.

160.   By virtue of this contract, Defendants were bound to produce a copy of Plaintiff Bretoi's PHI subjected to the requirements of 45 CFR 164.524.

161.   On or about March 22, 2016, Defendants copied to cd one .pdf file, BRETOI-BETH-1005702645.pdf.

162.   The cd was thereafter mailed to Plaintiff Bretoi's third party designee.

163.   That prior to copying these records, Plaintiff Bretoi's PHI with this medical provider was maintained in electronic format and did not need to be copied, converted, or scanned into electronic format.

164.   By virtue of their contract with Plaintiff Bretoi's medical provider, Defendants had access to Plaintiff Bretoi's PHI that was electronically stored prior to the production of Plaintiff Bretoi's records.

165.   Plaintiff Bretoi clearly requested in her February 26, 2016, letter that all records requested be produced in electronic format, on cd, and in .pdf format.

166.   After fulfilling Plaintiff Bretoi's request for her PHI, Defendants created in their name an invoice that they mailed to Plaintiff Bretoi's designated third party care of the Plaintiff Bretoi on or around March 22, 2016, invoice number 35781082. *See* Exhibit J.

167.   The invoice requested payment, noted payment due April 1, 2016, and to email questions to collections@healthport.com.

168.   The invoice listed hard copy page count 1452, quantity 1452.

169.   The invoice listed labor costs $0.36 per image, pages 1-200 for a total of $72.00.

170.   The invoice also listed Labor costs $0.12 per image, pages 201+ for a total of $150.24.

171.   Shipping and Handling was listed at $1.95 on the invoice and sales tax was listed at $17.09.

172.   The invoice was not produced prior to shipping of Plaintiff Bretoi's at-issue PHI in paper format.

173.   Because Plaintiff Bretoi attached to her request, HHS' "Individual Rights under HIPPA to Access their Health Information," Defendants' knew ahead of producing Plaintiff Bretoi's requested PHI of the following:

    a.  Defendants had to produce Plaintiff Bretoi's PHI in the form and format requested.

    b.  If unavailable in the form or format requested, Defendants had to inform Plaintiff Bretoi prior to the production of the costs and expenses associated to produce in the form or format requested.

    c.  HHS had determined the failure to inform a requester in advance of production of PHI that the PHI was unavailable in the form or format requested was an unreasonable measure.

    d.  When requested and available in electronic format, the most that Defendants could charge was $6.50, inclusive of all labor, supplies, and any applicable postage.

    e.  That to charge actual or average labor costs, they had to inform Plaintiff Bretoi in advance of those estimated costs.

174.   Defendants did not inform the Plaintiff Bretoi prior to the production of her PHI that the records were not available in electronic format or that there would be additional charges incurred to receive the requested information in this format.

175.   The invoice did not inform Plaintiff Bretoi that the at-issue records were not maintained in electronic format.

176.    The invoice did not calculate actual labor costs to fulfill Plaintiff Bretoi's request.

177.    The invoice did not outline any average costs in lieu of calculating labor costs individually.

178.    Defendants never contacted Plaintiff Bretoi prior to the production of her requested PHI to inform her there was actual or average labor costs associated with the production of her PHI requested.

179.    HHS has made clear March 1, 2016, per page fees (including images) were not permitted for electronic copies of PHI that are maintained electronically when that information is requested be produced in electronic format.

180.    Because Defendants did not go through the process of calculating actual or average allowable costs for Plaintiff Bretoi's requests for electronic copies of her PHI maintained electronically, and since Plaintiff Bretoi personally requested her PHI be produced in electronic format, Defendants could only charge a flat fee to Plaintiff Bretoi in the amount not to exceed $6.50, inclusive of labor, supplies, and any applicable postage.

181.    Defendants chose to ignore HHS' "access guidance" and charged Plaintiff Bretoi unreasonable costs and expenses for her request for electronic copies of her PHI maintained electronically, charging her $241.28.

182.   Since Defendants chose to forgo calculating their actual charges and average charges, the most Defendants could reasonably charge Plaintiff Bretoi for the copy of her PHI that had been maintained electronically was $6.50.

183.   Defendants were obligated to only charge this amount based on 45 CFR 164.524(c)(4) and the "business associate" contract they had with Plaintiff Bretoi's medical provider(s).

184.   On April 14, 2016, Plaintiff Bretoi had her personal attorneys respond to Defendants' unreasonable and unlawful invoice 35781082 via letter.   *See* Exhibit J.

185.   In   this   correspondence,   Defendants   were   informed   of   their unreasonable and illegal attempts to charge Plaintiff Bretoi for copies of her electronically stored PHI.

186.   As far back and 2013, Defendants were part of a HHS investigation where they had tried to charge a patient who requested and electronic copy of his/her electronically stored PHI per image fees, among others. *See* Exhibit E.

187.   Based on that investigation, HHS on November 19, 2014, issued a response to the complaint confirming Defendants attempt to charge a patient per image fees were not reasonable.

188.   The result of HHS' investigation involving Defendants was to have the medical provider amend its contract with Defendant to reflect the most Defendants could charge a patient who requested their electronically stored PHI be produced in electronic format was $6.50.

189.   In the April 14, 2016, letter to Defendants regarding Plaintiff Bretoi, Defendants were provided a copy of HHS' response to the complaint dated November 19, 2014.

190.   In addition, and on behalf of Plaintiff Bretoi, Defendants were sent a check for the outstanding invoice in the amount of $6.50.

191.   Defendants cashed this check and then continued to invoice for the alleged unpaid balance of $234.78 for invoice 35781082.  *See* Exhibit K attached hereto.

192.   As a result, Plaintiff Bretoi's personal attorney responded with a second letter to Defendants dated June 13, 2016. *See* Exhibit J.

193.   In this correspondence, Defendants were provided a copy of the HHS' publication of "Individuals' Right under HIPPA to Access their Health Information 45 CFR § 164.524."

194.   Defendants continued to invoice for the alleged unpaid balance. *See* Exhibit K.

195.   By sending a follow up invoice, crediting only the $6.50, Defendants re-affirmed its demand for unreasonable full payment in the amount of $241.28, an amount it was not entitled to.

196.   Instead of accepting the payment of $6.50 as full and final payment for invoice 35781082, Defendants continue to send account receivable statements on 06/15/16, 07/05/16, 08/01/16, 09/22/16, and 10/13/16.

197.   In each accounts receivable statements, Defendants continued to demand payment of $234.78, the amount remaining from invoice 35781082 after crediting the payment of $6.50.

198.   As a result of Defendants refusal to accept $6.50 for the copy of her PHI, and to avoid collection actions, on or about October 16, 2016, Plaintiff Bretoi wrote a check, number 1228, to Defendants in the amount of $234.78, in payment of Defendants' invoice 35781062.

199.   In the memo line of check 1228, Plaintiff Bretoi informed she "Paid under Protest."

200.   She included with this payment statement id 1354888, hand writing "Paid Under Protest! I do not believe I owe this bill."

201.   Defendants cashed Plaintiff Bretoi's check on or about October 21, 2016.

202.   On February 13, 2017, Plaintiff Bretoi sent a letter to Defendant IOD Inc. demanding a refund for the amount she was overcharged, and to refund everyone else that was overcharged.

203.   Defendants have not refunded Plaintiff Bretoi any money paid by her to date for the charges that exceeded $6.50.

## VIII. CLASS ACTION ALLEGATIONS

204.   Plaintiff restates each of allegations in all other paragraphs as if full stated herein.

205.   Plaintiffs, individually and on behalf of all others similarly situated, bring the above claims on behalf of three classes.

206.   Class 1 consists of:

**All persons in the United States whose PHI was maintained in electronic format, requested their PHI in electronic format, were provided an electronic copy of their PHI, and paid an invoice exceeding $6.50 from Defendants (or anyone working on behalf of Defendants).**

207.   Class 2 consists of:

**All persons in the United States whose PHI was maintained in electronic format, requested their PHI in electronic format, but were provided a copy of their PHI in a form or format other than electronic, and paid an invoice exceeding $6.50 from Defendants (or anyone working on behalf of Defendants) when Defendants, prior to producing the PHI did not inform the person of additional charges.**

208.   Class 3 consists of:

***All persons in the United States who requested their PHI in electronic format, regardless of whether or not the PHI was stored in electronic format, were provided a copy of their PHI, and paid an invoice exceeding $6.50 from Defendants (or anyone working on behalf of Defendants) when Defendants, prior to producing the PHI did not inform them of any additional charges.***

209.   Excluded from the Classes are Defendants, their legal representatives, assigns, and successors, and any entity in which Defendants have a controlling interest.   Also, excluded from the Classes is the Judge to whom this case is assigned, the Judge's staff and immediate family, and Plaintiffs' counsel and their employees.   Plaintiffs reserve the right to amend the above-stated class definitions based upon facts learned in discovery.

210.   Plaintiffs do not know the exact number of members in the Classes, but based upon the Defendants' volume of release of information requests for electronically stored PHI processed annually, Plaintiffs believe that the class members number at a minimum in the thousands.

211.   The joinder of all class members is impracticable due to the size and relatively modest value of each individual claim. The disposition of the claims in a class action will provide substantial benefit to both the parties and the Court in avoiding multiplicity of identical suits. The class members can be easily identified through records maintained by Defendants.

212.   There are questions of law or fact common to the Classes, which common issues predominate over any issues involving only individual class members.  Factual and/or legal issues common to each class member include:

a.   Whether Defendants' conduct is governed by the HIPPA, HITECH Act, and the Georgia Fair Business Practices Act;

b.   Whether Defendants' billing practice violates HIPPA, HITECH Act and the Georgia Fair Business Practices Act, is a breach of contract, provides unjust enrichment to Defendants; provides money had and received to Defendants, committed fraud and negligence misrepresentation;

c.   Whether the class members are entitled to damages based upon Defendants violating HITECH and the Georgia Fair Business Practices Act, breach of contract, unjust enrichment, money had and received, fraud, negligent misrepresentation, punitive damages, and attorney's fees; and

d.   Whether Defendants should be enjoined from engaging in such conduct in the future.

213.   Plaintiffs' claims are typical of those of the members of each Class. Within each Class, all claims are based on the same facts and legal theories.

214.   Plaintiffs will fairly and adequately protect the interests of each Class. They have retained counsel experienced in handling actions involving consumer deception, fraud, and class actions.  Neither Plaintiffs nor their counsel have any interest that might cause them not to vigorously pursue this action.

215.   Certification of each Class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

> a.  The questions of law or fact common to the members of each Class predominate over any questions affecting individual members; and
>
> b.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

216.   Certification of each Class under Rule 23(b)(2) of the Federal Rules of Civil Procedure is also appropriate in that Defendants have acted on grounds generally applicable to each Class thereby making appropriate relief with respect to each Class as a whole.

217.   Plaintiffs request that each Class be certified as a hybrid class under Rule 23(b)(3) for monetary damages, and pursuant to Rule 23(b)(2) for injunctive relief.

**COUNT I**
**BREACH OF CONTRACT**
*(Third-Party Beneficiary Breach of Contract)*

218.    Plaintiff re-alleges and incorporates by reference the foregoing allegations.

219.    Defendants entered into a contract with Plaintiffs' and class members' medical providers to service the release of Plaintiffs' PHI.

220.    Plaintiffs and class members requested a copy of their PHI from their medical providers.  Because Defendants were a "business associate" of Plaintiffs' and class members' medical providers, they were required by federal law to have a contract with these medical providers to service and produce a copy of the Plaintiffs' and class members' PHI.

221.    By virtue of being a "business associate" to Plaintiffs' and class members' medical providers, Defendants' contracted to provide Plaintiffs, and the other class members, costs provisions as outlined in 45 CFR 164.504(e).

222.    That these costs provisions were for the benefit of the Plaintiffs and the other class members so they could obtain copies of their PHI at a reasonable and fair rate; that they would have reasonable access to their PHI.

223.    That specifically, the contracts Defendants had with Plaintiffs' medical providers, and the medical providers of the classes, confirmed the right of Plaintiffs and the class members to access and obtain a copy of their PHI about

them in a designated record set, and in particular an electronic record set. *See* Exhibit D at ¶¶ 3, 11.8.

224. That specifically, the contracts Defendants had with Plaintiffs' medical providers, and the medical providers of the class, permitted Defendants to charge the Plaintiffs and the class a reasonable, cost base fee for or on behalf of itself, a business associate, and/or the covered entity.

225. Plaintiffs, and the class members, were one of the intended beneficiaries of the contracts with the medical providers since the subject of those contracts were the access and release of Plaintiffs and the class member's PHI to them upon their request for a fair and reasonable rate thereby effectuating the intent of the parties to provide Plaintiffs and the class reasonable access to their PHI when requested.

226. As evidenced by Defendants sample contract, Defendants are aware and responsible for violations of producing a person's PHI to the covered entity. *See* Ex. D at ¶ 11.5.

227. Defendants have breached the contracts by imposing on the Plaintiffs, and the members of the class, an unreasonable, cost based fee in excess of $6.50, in direct violation of the covered entity's obligations under 45 CFR 164.524, when Plaintiffs and the class requested their PHI to be produced in electronic format.

48

228.    Defendants have breached the contracts by imposing on the Plaintiffs, and the members of the class, an unreasonable, cost based fee in excess of $6.50, in direct violation of the covered entity's obligations under 45 CFR 164.524, when Plaintiffs and the class requested their PHI be produced and Defendants never informed them prior to production of actual or average labor charges to produce the PHI.

229.    The promise to perform by Defendants with Plaintiffs and the class members' medical providers was intended to give Plaintiffs and the class members the benefit of reasonable access to their PHI. *See* Exhibit D at ¶¶ 3, 11.8.

230.    This benefit is evident because Plaintiffs' and class members' medical providers (the covered entities) and Defendants are subjected to civil penalties should they fail to properly protect and secure Plaintiffs' and class members' PHI. It is the violation of Plaintiffs' and class members' rights that are the subject of discipline.

231.    Plaintiffs and class members relied on Defendants' invoices and paid them.

232.    Defendants' breach of contract has resulted in damages to the Plaintiff Kuchenmeister in the amount of $71.62, Plaintiff Gravitt in the amount of $91.21,

and Plaintiff Bretoi in the amount of $234.78, and millions to the classes, an exact amount to be determined at trial.

233.    Plaintiffs, individually and on behalf of the classes, seek damages for Defendants' breach of contract, as well as interest, reasonable attorney's fees, expenses, and costs to the extent allowable by law.

## COUNT II.
## UNJUST ENRICHMENT

234.    Plaintiff re-alleges and incorporates by reference the foregoing allegations.

235.    45 CFR 164.524(c)(4)(i-iv), establishes an individual right to obtain a copy of his PHI from a covered entity (i.e., his health care provider) for a reasonable cost based fee.

236.    Based on 45 CFR 164.524(c)(4)(i-iv), on March 26, 2016, HHS determined and advised all covered entities and their business associates that unless they want to charge actual costs or average costs for the production of electronically stored PHI in electronic format, the most they can charge is $6.50.

237.    Defendants are business associates to Plaintiffs' and class members' medical providers.

238.    HHS has further provided a sample contract which was acceptable to use between a covered entity and business associate, which illustrated the contract

between the two needed a clause providing that a business associate would make available protected health information in a designated record set to the individual or the individual's designee as necessary to satisfy covered entity's obligations under 45 CFR 164.524. *See* http://www.hhs.gov/hipaa/for-professionals/covered-entities/sample-business-associate-agreement-provisions/index.html (Last accessed on January 31, 2017); *See also* Exhibit D.

239.   That those obligations under 45 CFR 164.524 are Plaintiffs' and the classes rights to obtain their PHI.

240.   Defendants knew prior to March 26, 2016, but at a minimum after March 26, 2016, the most they could charge an individual who requested the production of their PHI, that was stored electronically, in electronic format was $6.50 if they did not in advance inform the individual of the actual costs or average costs in producing the requested information. *See* Exhibits E and F.

241.   As evidenced by Defendants sample contract, Defendants are aware and responsible for violations of producing a person's PHI. *See* Ex. D at ¶ 11.5.

242.   Based on Defendants services of producing Plaintiffs' and class members' electronically stored PHI in electronic format as requested by the Plaintiffs, Defendants created invoices and charged the Plaintiffs.

243.   That these invoices concealed from the Plaintiffs and class member the material fact that all Plaintiffs' and the class members only owed for the production of their PHI $6.50.

244.   The purpose of these invoices were to misrepresent the actual amount owed by Plaintiffs and the class members for the production of their PHI, thereby requesting payment by deceit from the Plaintiffs and the class members.

245.   When Defendants continued to invoice Plaintiffs after voluntary payments under protest, Defendants ratified their misrepresentations and deceptive practices under the guise and authority of past due notices, delinquency notices, and the threat that outstanding invoices may be forwarded to a collection agency with possible legal action.

246.   These invoices charged an amount that was unreasonable, illegal, and unlawful as they were in violation of 45 CRF 164.524(c)(4)(i-iv).

247.   Plaintiffs and class members relied on Defendants' invoices and paid them.

248.   Since Plaintiffs, and the class, had a right to receive their electronically stored PHI in electronic format for $6.50, and Defendants received from those Plaintiffs' and the class more than $6.50, Defendants received a benefit through misrepresentation and deceit of value from the Plaintiffs.

249.    The benefits Defendants received were based on unreasonable, illegal and unlawful charges in that Defendants billed per page, excessive shipping, for production of PHI in a form and format not requested, and exceeded the maximum $6.50 that could be charged based on the Plaintiffs' and class members' requests for their PHI.

250.    Such excessive benefit constitutes unjust enrichment for Defendants.

251.    Based on the illegal retention of Plaintiff Kuchenmeister's $71.62, Plaintiff Gravitt's $91.21, and Plaintiff Bretoi's $234.78, and millions to the classes, Defendants have been unjustly enriched in the amount of $397.61, plus millions from the class members, an amount to be determined at trial.

252.    Plaintiffs, individually and on behalf of the classes, seek restitution of Defendants' unjust enrichment, as well as interest, reasonable attorney's fees, expenses, and costs to the extent allowable, and any other relief necessary to make them whole.

253.    Plaintiffs have been damaged in the amount of $397.61 and are therefore entitled to the return of their money in the amount of Plaintiff Kuchenmeister's $71.62, Plaintiff Gravitt's $91.21, and Plaintiff Bretoi's $234.78, and millions to the classes.

## COUNT III.
## MONEY HAD AND RECEIVED

254.  Plaintiff re-alleges and incorporates by reference the foregoing allegations.

255.  45 CFR 164.524(c)(4)(i-iv), establishes an individual right to obtain a copy of his PHI from a covered entity (i.e., his health care provider) for a reasonable cost based fee.

256.  Based on 45 CFR 164.524(c)(4)(i-iv), on March 26, 2016, HHS determined and advised all covered entities and their business associates that unless they want to charge actual costs or average costs for the production of electronically stored PHI in electronic format, the most they can charge is $6.50.

257.  Defendants are business associates to Plaintiffs' and class members' medical providers.

258.  HHS has further provided a sample contract which was acceptable to use between a covered entity and business associate, which illustrated the contract between the two needed a clause providing that a business associate would make available protected health information in a designated record set to the individual or the individual's designee as necessary to satisfy covered entity's obligations under 45 CFR 164.524.  *See* http://www.hhs.gov/hipaa/for-professionals/covered-

entities/sample-business-associate-agreement-provisions/index.html (Last accessed

on January 31, 2017).

259.   That those obligations under 45 CFR 164.524 are Plaintiffs' and the

classes rights to obtain their PHI.

260.   Defendants knew prior to March 26, 2016, but at a minimum after

March 26, 2016, the most they could charge an individual who requested the

production of their PHI, that was stored electronically, in electronic format was

$6.50 if they did not in advance inform the individual of the actual costs or average

costs in producing the requested information.  *See* Exhibits E and F.

261.   Based on Defendants services of producing Plaintiffs' and class

members' electronically stored PHI in electronic format as requested by the

Plaintiffs, Defendants created invoices and charged the Plaintiffs.

262.   That these invoices concealed from the Plaintiffs and class member

the material fact that all Plaintiffs' and the class members owed for the production

of their PHI was $6.50.

263.   Plaintiffs and class members relied on Defendants' invoices and paid

them.

264.   The purpose of these invoices were to misrepresent the actual amount owed by Plaintiffs and the class members for the production of their PHI, thereby requesting payment by deceit from the Plaintiffs and the class members.

265.   When Defendants continued to invoice Plaintiffs after voluntary payments under protest, Defendants ratified their misrepresentations and deceptive practices under the guise and authority of past due notices, delinquency notices, and the threat that outstanding invoices may be forwarded to a collection agency with possible legal action.

266.   These invoices charged an amount that was unreasonable, illegal, and unlawful as they were in violation of 45 CRF 164.524(c)(4)(i-iv).

267.   Since Plaintiffs, and the class, had a right to receive their electronically stored PHI in electronic format for $6.50, and Defendants received from those Plaintiffs' and the class more than $6.50, Defendants received money in excess of what they should have from Plaintiffs and class members.

268.   The benefits Defendants received were based on unreasonable, illegal and unlawful charges in that Defendants billed per page, excessive shipping, for production of PHI in a form and format not requested, and exceeded the maximum $6.50 that could be charged based on the Plaintiffs' and class members' requests for their PHI.

269.    Defendants will not be prejudiced by refunding the amounts Plaintiffs and class members paid in excess by of $6.50.

270.    Based on the illegal retention of Plaintiff Kuchenmeister's $71.62, Plaintiff Gravitt's $91.21, and Plaintiff Bretoi's $234.78, and millions to the classes, Defendants have received an excess in the amount of $397.61, plus millions from the class members, an amount to be determined at trial.

271.    Plaintiffs, individually and on behalf of the classes, seek recovery of the overpayments, as well as interest, reasonable attorney's fees, expenses, and costs to the extent allowable, and any other relief necessary to make them whole.

## COUNT IV.
## FRAUD

272.    Plaintiffs re-allege and incorporate by reference by reference the foregoing allegations.

273.    Plaintiffs and class members requested their PHI be produced in electronic format from their medical provider.

274.    Defendants, based on their contract with Plaintiffs' and class members' medical provider, serviced that request.

275.    Plaintiffs' and class members' PHI at-issue was maintained in electronic format prior to the request of their PHI.

276.  Based on 45 CFR 164.524(c)(4)(i-iv), on March 26, 2016, HHS determined and advised all covered entities and their business associates that unless they want to charge actual costs or average costs for the production of electronically stored PHI in electronic format, the most they could charge was $6.50.

277.  Defendants knew prior to March 26, 2016, but at a minimum after March 26, 2016, the most they could charge an individual who requested the production of electronically stored PHI in electronic format was $6.50 if they did not in advance inform the individual of the actual costs or average costs in producing the requested information.  *See* Exhibits E and F.

278.  Based on Defendants services of producing Plaintiffs' and class members' PHI electronically as requested by Plaintiff, Defendants created invoices.

279.  Defendants' invoices were a misrepresentation, misleading statements, and based on deceptive practices since they charged Plaintiffs and class members in excess of $6.50 for those services.

280.  Defendants created these invoices with the intent that Plaintiffs and class members rely on the charged amount in connection with the sale of their PHI.

281.   Defendants invoice created confusion on what was really owed for the production of Plaintiffs' and class members medical records.

282.   Plaintiffs and class members relied on Defendants' invoices and paid them.

283.   When Defendants continued to invoice Plaintiffs after voluntary payments under protest, Defendants ratified their misrepresentations and fraudulent practices under the guise and authority of past due notices, updated invoices reflecting partial payments, delinquency notices, and the threat that outstanding invoices may be forwarded to a collection agency with possible legal action.

284.   As evidenced by Defendants sample contract, Defendants are aware and responsible for violations of producing a person's PHI.  *See* Ex. D at ¶ 11.5.

285.   Knowing there was a long process in place to remedy any disputes with a third party and a covered entity, and knowing Defendants would indemnify the covered entity only after final judgment or non-appealable judgments, Defendants maintained this fraudulent billing practice as it generated significant money for them.

286.   Plaintiffs were justified in relying on Defendants' invoices and requests for payment given it was official looking, requested payment, and was for the production of their electronically stored PHI.

287.   As a result of Defendants' false representations, Plaintiff and the class members have suffered damages.

## COUNT V.
## NEGLIGENT MISREPRESENTATION

288.   Plaintiffs re-allege and incorporate by reference by reference the foregoing allegations.

289.   By law, Defendants entered into contracts with hospitals, physicians, and group practices to copy and produce individual's electronic copies of their electronically stored PHI.

290.   As a result, Defendants stood in a confidential and fiduciary relationship to Plaintiffs both legally, morally, and socially.

291.   By virtue of Defendants entering into contracts with hospitals, physicians, and group practices to copy and produce consumers electronic copies of their PHI (engagement), Defendants assumed a position of superiority and influence over those consumers who requested their PHI from those engaged hospitals, physicians, and group practices by retrieving (and delaying production for prepayment), copying, mailing, transmitting, billing, and/or collecting unpaid invoices against those consumers that requested their PHI.

292.   Only owing up to $6.50 when a consumer requests his electronically stored PHI be produced in electronic format is special knowledge by Defendants

that is material to the amount that a consumer must pay when he requests the production of his PHI from his medical provider.

293.  Defendants, being a leader in HIPPA and HITECH compliance for their customers, i.e., hospital, physicians, and group practices, as well as subjected to countless complaints filed against its customers for charging violations, had this special knowledge that consumers only owed $6.50 when they requested their electronically stored PHI that was stored electronically and produced in electronic format; assuming Defendants did not prior to the production of said information inform of the actual or average costs consistent with 45 CFR 164.525(c).

294.  Defendants, by virtue of its special knowledge of the material fact expressed above, and based on its status of standing in a confidential or fiduciary relationship, had a duty to disclose to Plaintiffs and those similarly situated, the material fact that they only owed up to $6.50 for the production of their electronically stored PHI in electronic format when stored electronically.

295.  Instead, Defendants created invoices and charged Plaintiffs more than $6.50 for Defendants' services when it should have only charged Plaintiffs and the class members $6.50 for those services.

296.  Plaintiffs and the class members relied on these invoices and paid them.

297.   Based on 45 CFR 164.524(c)(4)(i-iv), on March 26, 2016, HHS determined and advised all covered entities and their business associates that unless they want to charge actual costs or average costs for the production of electronically stored PHI in electronic format, the most they could charge was $6.50.

298.   Defendants knew prior to March 26, 2016, but at a minimum after March 26, 2016, the most they could charge an individual who requested the production of electronically stored PHI in electronic format was $6.50 if they did not in advance inform the individual of the actual costs or average costs in producing the requested information.  *See* Exhibits E and F.

299.   The creation of these invoices implied Defendants had a financial interest in the transaction of producing Plaintiffs' electronically stored PHI.  *See also* Exhibit D.

300.   The creation and production of the at-issue invoices to Plaintiffs were the result of, at a minimum, Defendants failure to use reasonable care or competence in supplying Plaintiffs' electronically stored PHI for $6.50, since they knew or should have known of HHS' issuance of "access guidance".

301.   Plaintiffs and class members relied on Defendants assertion they owed more than $6.50 when they mailed payment to Defendants.

302.   Plaintiffs were justified in relying on Defendants' invoices and requests for payment given it was official looking, requested payment, and was for the production of their electronically stored PHI from Plaintiff's medical providers Health Partners Clinics.

303.   This reliance was further justified when Defendants continued to invoice Plaintiffs after voluntary payments under protest.

304.   Defendants ratified their misrepresentations under the guise and authority of past due notices, updated invoices reflecting partial payments, delinquency notices, and the threat that outstanding invoices may be forwarded to a collection agency with possible legal action.

305.   As a result of Defendants' false representations, Plaintiffs and the class members have suffered damages, since Plaintiffs only owed $6.50 for the production of their electronically stored PHI produced in electronic format.

## COUNT VI.
## VIOLATIONS OF THE FAIR BUSINESS PRACTICES ACT
### (O.C.G.A. §10-1-393, *et seq.*)

306.   Plaintiffs re-allege and incorporate by reference by reference the foregoing allegations.

307.   The Georgia Fair Business Practices Act ("FBPA) (O.C.G.A. §10-1-393, *et seq.*) forbids and declares unlawful any unfair or deceptive acts or practices

Case 1:17-cv-01001-RWS    Document 1    Filed 03/20/17    Page 64 of 73

in the conduct of consumer transactions and consumer acts or practices in trade or commerce. The stated intent of the FBPA is to protect the public from acts and practices which are injurious to the general consuming public.

308. Defendants' conduct, as described herein, has and continues to harm the consuming public.

309. Plaintiffs and class members requested their PHI be produced in electronic format from their medical providers.

310. Defendants, based on their contracts with Plaintiffs' and class members' medical providers, serviced those requests for PHI by copying, mailing, and thereafter invoicing for the services provided to the Plaintiffs.

311. That the copying, mailing, and invoicing by Defendants, i.e., servicing the patient request for an electronic copy of their PHI, are a "consumer transaction" as that term is defined under §10-1-392.

312. That Plaintiffs and class members are "consumers" as that term is defined under § 10-1-392.

313. That Defendants are a "person" as that term is defined under § 10-1-392.

314.   That the servicing of Plaintiffs' and class members' requests for electronic copies of their PHI is also "trade" and "commerce" as defined under § 10-1-392.

315.   Under § 10-1-393(a), Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful.

316.   As already alleged, Plaintiffs' and class members' PHI at-issue was maintained in electronic format prior to the requests of their PHI.

317.   When Plaintiffs and class members requested their PHI be produced in electronic format, the most they owed for the production of this PHI was $6.50 based on the facts as outlined infra.

318.   Based on Defendants' services of producing Plaintiffs' and class members' PHI, Defendants created deceptive and misleading invoices, charging more than $6.50, a practice Defendants engaged in its normal course of business and more than on an individual basis as evidenced by Defendants' practice with the three unrelated Plaintiffs, and the class members.

319.   As evidenced by Defendants sample contract, Defendants were aware and responsible for violations of producing a person's PHI.  *See* Ex. D at ¶ 11.5.

320.  Knowing there was a long process in place to remedy any disputes with a third party and a covered entity so it could be corrected when the deceitful billing was questioned, and knowing Defendants would indemnify the covered entity only after final judgment or non-appealable judgments, Defendants maintained this fraudulent billing practice as it generated significant money for them.

321.  Defendants creation and presentation to Plaintiffs, and those like them, had the likelihood of creating confusion and misunderstanding on what Plaintiffs and class members actually owed for the production of their PHI that had been previously stored in electronic format and produced in electronic format.

322.  Because Defendants engage in this deceptive and unfair conduct with consumers who requested their PHI in electronic format, to be produced in electronic format, there is an outcry of public interest to end this arrogant and unlawful conduct to protect consumers nationwide.

323.  Pursuant to § 10-1-399(b), both Plaintiffs Bretoi and Gravitt provided written notice to Defendants with a demand for relief that they only owed $6.50, described with detail the unfair and deceptive acts of the Defendants, and provided payment as settlement of the dispute of $6.50.

324.   Instead of accepting Plaintiffs Bretoi and Gravitt's tender of settlement for $6.50, Defendants maintained their unfair and deceptive acts by cashing the payments provided by the Plaintiffs and thereafter invoicing for additional money.

325.   That these invoices concealed from the Plaintiffs and class members, the material fact that all Plaintiffs and the class members really owed for the production of their PHI was $6.50.

326.   The purpose of these invoices were to misrepresent the actual amount owed by Plaintiffs and the class members for the production of their PHI, thereby requesting payment by deceit from the Plaintiffs and the class members.

327.   When Defendants continued to invoice Plaintiffs after voluntary payments under protest, Defendants ratified their misrepresentations and fraudulent practices under the guise and authority of past due notices, updated invoices reflecting partial payments, delinquency notices, and the threat that outstanding invoices may be forwarded to a collection agency with further possible legal action.

328.   Plaintiffs were justified in relying on Defendants' continued invoices and requests for additional payments given the continued requests were official

looking, requested payment, and were for the production of their electronically stored PHI.

329.    Based on Defendants deceitful and illegal conduct, Plaintiffs paid Defendants' outstanding invoices.

330.    Charging more than is actually owed for the production of PHI by Defendants is an unfair and deceitful practice under 10-1-393(a) and thereby unlawful.

331.    Defendants cashed Plaintiffs' checks.

332.    As a result of Defendants unfair and deceptive acts and practices, Plaintiffs and the class members suffered damages as outlined infra.

333.    Defendants have continued the damages on the Plaintiffs and the class members since they have not refunded or returned the money they obtained through their unfair and deceptive practices and acts.

334.    Pursuant to *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331 (11th Cir. 2015), Plaintiffs are able to bring an action under § 10-1-393 in their representative capacity, as well as individually.

335.    Under § 10-1-399(a), Plaintiffs and the class members are entitled to injunctive relief against Defendants, to require Defendants to stop billing

individuals more than $6.50 who request their electronically stored PHI be produced in electronic format.

336.   Plaintiffs and the class members are entitled to the return of their money paid that exceeds $6.50 for the production of their electronically stored PHI.

337.   That Defendants acts were "intentional" as that term is defined under § 10-1-392 in that Defendants were made aware of their unlawful billing practice, provided written notice of their violation, provided a check from two of the Plaintiffs outlining their illegal acts with an attempt to settle or compromise those illegal acts, thereafter cashing said checks, and providing additional invoices with the threat of collection for non-payment of the additional alleged money owed.

338.   This action is brought to guarantee consumers who request their PHI have reasonable access to their electronic medical records.

339.   That pursuant to § 10-1-399(c), Plaintiffs and the class are entitled to three times the damages suffered because Defendants' unfair and deceptive acts as described supra were intentional.

340.   That pursuant to § 10-1-399(a), Plaintiffs and the class are entitled to exemplary damages because Defendants' unfair and deceptive acts as described supra were intentional.

341.   Under § 10-1-399(d), Plaintiffs and the class are entitled to attorney fees and costs.

## COUNT VII.
## PUNITIVE DAMAGES

342.   Plaintiffs re-allege and incorporate by reference by reference the foregoing allegations

343.   Defendants have shown willful misconduct, malice, fraud, wantonness, or an entire want of care, all of which raise the presumption of a conscious indifference to consequences.

344.   Punitive damages in an amount not less than $1,000,000 should be imposed to punish Defendants and to deter such future conduct.

## COUNT VIII.
## ATTORNEY'S FEES

345.   Plaintiffs re-allege and incorporate by reference by reference the foregoing allegations.

346.   Defendants have acted in bad faith, have been stubbornly litigious or have caused Plaintiff unnecessary trouble and expense.

347.   Plaintiffs are entitled to recover from Defendants the expenses of litigation (including but not limited to reasonable attorney's fees and out-of-pocket

expenses) incurred by Plaintiffs in pursing the instant action, including without limitation, any such expenses warranted under O.C.G.A. Section 13-6-11.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and in favor of the Classes, and against Defendants for:

a.    An order certifying this case to proceed as a class action pursuant to Federal Rules of Civil Procedure 23, establishing the appropriate Classes and any Sub-classes the Court deems appropriate, finding that Plaintiffs are proper representatives of the Classes, and appointing the lawyers and law firms representing Plaintiffs as counsel for the Classes;

b.    A return of Plaintiffs' out-of-pocket damages in any amount paid that exceeds $6.50.

c.    Award to Plaintiffs and the members of the Classes all compensatory damages provided for and consistent with their claims for relief;

d.    Award to Plaintiffs and the members of the Classes all exemplary and/or punitive damages allowed by law that the Court deems appropriate;

e.    An injunction requiring Defendants to cease all unreasonable billing practices as outlined under Federal law;

f.    Reasonable attorney's fees, litigation expenses and costs of suits; and

g.    Such further relief as this Court may deem appropriate.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Date: March 20, 2017                    Respectfully submitted,


SKAAR & FEAGLE, LLP

By:    /s/ Justin T. Holcombe
       Justin T. Holcombe
       Georgia Bar No. 552100
       jholcombe@skaarandfeagle.com
       Kris Skaar
       Georgia Bar No. 649610
       kskaar@skaarandfeagle.com
       133 Mirramont Lake Drive
       Woodstock, GA 30189
       Tel:   (770) 427-5600
       Fax:   (404) 601-1855

       James M. Feagle
       Georgia Bar No. 256916
       jfeagle@skaarandfeagle.com
       Cliff R. Dorsen
       Georgia Bar No. 149254
       cdorsen@skaarandfeagle.com
       2374 Main Street, Suite B
       Tucker, GA 30084
       Tel:   (404) 373-1970
       Fax:   (404) 601-1855

**JOHNSTON | MARTINEAU, P.L.L.P.**

*/s/Christopher P. Martineau*
Christopher P. Martineau, Esq.
Attorney I.D.#0329265
Christopher A. Johnston, Esq.
Attorney I.D. #031156X
2233 Hamline Avenue North, Suite 550
Roseville, MN 55113
Telephone: (612) 767-7790
Facsimile: (612) 379-0480
cmartineau@jmlegal.com
cjohnston@jmlegal.com

**KEOGH LAW, LTD.**

*/s/ Keith J. Keogh*
Keith J. Keogh
Donald L. Sawyer
55 W. Monroe St., Suite 3390
Chicago, Illinois, 60603
312.726.1092 (office)
312.726.1093 (fax)
keith@keoghlaw.com
dsawyer@keoghlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*