1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3
     LEON KUCHENMEISTER, et al.,     )
4             Plaintiffs,            )
                                     ) Civil Action
5     -vs-                           ) No. 1:17-CV-1001-RWS
                                     )
6     HEALTHPORT TECHNOLOGIES,       )
     LLC, et al.,                    )
7             Defendants.            )

8

9
                   Transcript of Motions Proceedings
10            Before the Honorable Richard W. Story
                 United States District Court Judge
11                    November 13, 2017
                       Atlanta, Georgia
12

13

14

15   APPEARANCES OF COUNSEL:

16   On behalf of
     the Plaintiffs:          Christopher Peter Martineau, Esq.
17                            Keith James Keogh, Esq.
                              Justin Tharpe Holcombe, Esq.
18
     On behalf of
19   Defendants:              Jay P. Lefkowitz, Esq.
                              Alexandra Strang, Esq.
20                            William Vance Custer, Esq.
                              Nathaniel J. Kritzer, Esq.
21

22
     Reported stenographically by:
23   Amanda Lohnaas, RMR, CRR
     Official Court Reporter
24   United States District Court
     Atlanta, Georgia
25   (404) 215-1546

1        (Monday, November 13, 2017, 2:05 p.m.; Atlanta,

2   Georgia.)

3        THE COURT:  Be seated.

4        THE COURTROOM DEPUTY:  Court now calls for oral argument

5   in Civil Action 1:17-CV-1001, Kuchenmeister, et al. versus

6   Healthport Technologies, LLC, et al.

7        Counsel, will you please state your name for the record?

8        MR. MARTINEAU:  Chris Martineau for the plaintiffs.

9        MR. KEOGH:  Good afternoon, Your Honor, Keith Keogh for

10  the plaintiffs.

11       MR. HOLCOMBE:  Good afternoon, Justin Holcombe for the

12  plaintiffs.

13       THE COURT:  Good afternoon.

14       MR. CUSTER:  Your Honor, Bill Custer, Bryan Cave, for

15  Ciox.

16       MS. STRANG:  Good morning, Ally Strang for Ciox.

17       MR. LEFKOWITZ:  Good afternoon, Your Honor, Jay

18  Lefkowitz also for Ciox.

19       MR. KRITZER:  Nathaniel Kritzer also for Ciox.

20       THE COURT:  Good afternoon.

21       Okay, we are here for purposes of having oral argument

22  on pending motions to dismiss that have been filed on behalf

23  of Ciox.

24       And let me say to counsel I have read the briefs that

25  have been submitted and have reviewed a number of exhibits.

1   I will not represent to you that I have reviewed every

2   exhibit that's been submitted, you have submitted a fair

3   number, but I think I've looked at the ones that hopefully

4   are the most important.  So there's not a need to take me

5   from the very base forward; I have a general knowledge of

6   what we're here about and I think what the issues are about.

7   So I would urge you during your presentations to focus on

8   what you think are the essential matters and certainly to

9   respond to the extent you wish to in terms of the subsequent

10  briefing that may have occurred in the case.

11      In some instances I would, since the defendant has filed

12  a reply brief, I would immediately start with the plaintiffs.

13  But since this is a little complex and there are some issues

14  that you may want to set the table from the perspective of

15  the defendants, I'll allow the defendant to proceed initially

16  since you are the moving party and I'll hear from counsel at

17  this time.

18      MR. LEFKOWITZ:  Thank you, Your Honor, Jay Lefkowitz.

19  Given that initial admonition, I'll try to be quite brief and

20  then, obviously, save whatever time I need to handle any

21  rebuttal after your colloquy with the plaintiffs.

22      I also want to thank you for scheduling oral argument, I

23  know that's not always what Your Honor does, and, consistent

24  with your local rule, I have invited my colleague Ally

25  Strang, who is a graduate of New York Law School, class of --

1    NYU Law School, sorry, class of 2014, to present argument

2    with me.

3         She's going to handle the issues relating to voluntary

4    payment and money had and received, as well as the unjust

5    enrichment.  And what I'm going to do, Your Honor, if I may,

6    is just take maybe 10 to 12 minutes, hopefully no longer, and

7    set the table and address what I think are the preliminary

8    issues that really address both the 12(b)(1) and the 12(b)(6)

9    having to do with whether there's even a viable claim here

10   for relief, and then I'll talk a little bit about the state

11   fraud and negligent misrepresentation claims which I think

12   are related to that.

13        So, Your Honor, if I may, the plaintiffs are bringing

14   state law claims for charging more than $6.50 per record.

15   The one thing that I think we all agree on is there is no

16   private right of action under HIPAA.

17        But that's about the end of our agreement because what

18   they then do is they file a complaint and, with respect to

19   every single claim for relief in the complaint, what they're

20   really doing is pleading that we are in fact violating HIPAA,

21   and in particular we're violating not only -- not the statute

22   itself, although there wouldn't be a private right of action

23   under the statute, as the Eleventh Circuit has said most

24   recently in the *Diaz* case and before that in the *Nemo versus*

25   *Bright* case, but they're actually focused on something that

1   is not even a statute -- not even a regulation that went

2   through notice and comment rule-making, but a website FAQ,

3   something posted on the website that says $6.50.  And that's

4   what they're hanging their hat on, and that didn't even go

5   through notice and comment rule-making.

6        But just to point to the complaint, since that's the

7   operative document, and I'll just give you a few citations

8   from the complaint, on the breach of contract claims at 227

9   and 228 they say defendants breached the contract by imposing

10  a fee in excess of 6.50.

11       For unjust enrichment at paragraph 248, they received a

12  benefit through misrepresentation by receiving more than

13  6.50.

14       Money had and received, paragraph 267, and fraud,

15  paragraph 279, they say the invoices were a misrepresentation

16  because they charged more than 6.50.

17       Negligent misrepresentation at paragraph 294, the

18  defendants had a duty to disclose that they only owed up to

19  $6.50.

20       And finally on the Business Practices Act claim at

21  paragraph 318, defendants created deceptive and misleading

22  invoices charging more than 6.50.

23       So I think it's clear what the thrust of this case is.

24       The leading case here, obviously it's the *Bright versus*

25  *Nemo* case, but the Eleventh Circuit in 2012 at *Diaz* amplified

1   the same point and cited with approval *Bright versus Nemo*

2   when it affirmed the dismissal of the state law wrongful

3   foreclosure claim, even though there was Veterans

4   Administration guidance on point having to do with

5   foreclosure issues, and the Court said, sorry, you can't do

6   an end run around the no private right of action.

7   And Your Honor followed *Bright versus Nemo* in a case

8   called *Chapman versus Mortgage Electronic Registration*

9   *Services*, 2013 WL 4855259, on the same point, although in

10  effect even in a stronger way than our case because in that

11  case there was actually a VA regulation that had gone through

12  notice and comment rule-making that was on point in terms of

13  getting an approval for an assignment.

14  And even there where you actually had a regulation as

15  opposed to a guidance, the court threw that claim out.

16  Now, what did they do to get around that?  They say,

17  well, we're actually just bringing common-law claims and

18  we're looking to the HIPAA $6.50 as a guidepost.  I want to

19  just be very brief about that.  They cite three, four, five

20  cases from around the country.  There is no Georgia case that

21  actually says that you can use HIPAA as a guidepost to bring

22  a claim that is otherwise foreclosed.

23  But even under those cases there's a dramatic

24  distinction here.  The *Fanean versus Rite Aid* case of

25  Delaware Superior Court which they cite from 2009, is a

1    paradigmatic example of the difference because in that case

2    there was an invasion of privacy claim, a state law claim

3    brought in the case for invasion of privacy, but the

4    definition, the metrics, how do you understand what invasion

5    of privacy means wasn't well defined under Delaware law so

6    the Delaware court said, okay, in that situation where you're

7    actually bringing a state common-law claim we can look to

8    federal law to fill in the gaps as a guidepost.

9        Here they don't have an independent state law claim.  So

10   I would suggest, Your Honor, that as a threshold matter this

11   case is an easy case to resolve because all they are

12   effectively doing is trying to get around the no private

13   right of action that the Eleventh Circuit and Your Honor has

14   previously amplified, and in fact, they're not even trying to

15   bring a statutory or a regulatory claim; they're bringing a

16   claim about guidance.

17       Now I do want to speak briefly about their fraud and

18   negligent misrepresentation claim because those are state law

19   claims and I think we have to give them their due.

20       The plaintiffs allege that they relied on defendants'

21   invoices and they paid them.  This is at the complaint at

22   231, 247, 263, and 282.  But their allegations themselves

23   actually disprove their own reliance.  After all, they say in

24   their complaint:  "Defendants were informed of their

25   unreasonable and illegal attempts to charge Plaintiff Gravitt

1    for copies of her electronically stored PHI."  That's at 138.

2        Well, they clearly weren't misled if they are alleging

3    that they were putting us on notice that we were in violation

4    of their view of the law.

5        And, moreover, there's another problem with their fraud

6    claim.  At best they're pleading a misrepresentation of law,

7    which under *Lakeside Investment Group versus Allen*, Georgia,

8    253 Ga. App. 458, and several other well-known precedents,

9    you can't plead misrepresentation of law; you can only plead

10   misrepresentation of fact.

11       And what are they saying?  At 277:  "Defendants knew

12   prior to March 26, 2016, but at a minimum after that, that

13   the most they could charge an individual who requested the

14   production of electronically stored PHI in electronic format

15   was 6.50."

16       That's their allegation.  Their allegation is that we

17   made a misrepresentation as to the law.

18       In fact, in their brief at page 12, in their response

19   brief, they say, look, they claim, quote, "Ciox states the

20   amount that Ciox charged in its invoice was not a false

21   statement or a misrepresentation."

22       It set forth the exact amount that Ciox was charging,

23   and that's a correct summary of what we said.  Then they go

24   on to say, and I quote:  "That it did and that," quote, "the

25   exact amount that Ciox was charging which Ciox has not and

1 cannot deny was a material misrepresentation of the amount

2 Ciox was permitted to charge."

3 So, Your Honor, they have two problems with their claims

4 for misrepresentation.

5 The first problem is they certainly didn't rely on

6 anything because they actually told us, put us on notice that

7 they thought we were misleading them and that it was not an

8 accurate amount or a lawful amount to pay. So there's no

9 justifiable reliance.

10 And, number two, there's no misrepresentation of fact.

11 At most there's a misrepresentation of law.

12 And that's why their fraud and negligent

13 misrepresentation claims simply fail.

14 Finally, their Georgia Business Practices Act claim

15 fails because misrepresentation or reliance are required for

16 this claim. It's an element of the claim. *Zeeman versus*

17 *Black*, 156 Ga. App. 82 at page 87: "A claimant who alleges

18 the FBPA was violated as a result of a misrepresentation must

19 demonstrate that he was injured as the result of the reliance

20 on the alleged misrepresentation."

21 So wholly apart from the secondary elements under the

22 Georgia Business Practices Act, which is that if it's a

23 heavily regulated area, which this is, and which their own

24 complaint makes clear it's heavily regulated and we cited all

25 sorts of documentation about the extent to which HHS

1  investigates claims under HIPAA, but wholly apart from that

2  basis for denying the claim under the Business Practices Act,

3  they also simply can't prove, even allege the claim because

4  they haven't alleged the fraud or the negligent

5  misrepresentation.

6      The last thing I want to mention before I yield to my

7  colleague is their contract claim, because it's our position

8  that they lack standing to sue under the Ciox contracts.

9      These business associate agreements, and we've attached

10 the three business associate agreements that are applicable

11 to each of the healthcare providers -- Health Partners,

12 Allina, and HealthEast -- each one of them unambiguously

13 disclaims third-party rights.  And the language is almost

14 identical, we've cited it in our exhibits, I'll just quote

15 from one of them:  "This BAA confers no enforceable legal

16 right or remedy on any individual or entity other than the

17 parties unless expressly is provided."

18     Another one, it says:  "The agreement inures to the

19 benefit of the parties hereto but not to the benefit of any

20 other third party," and it's the same language in all.

21     Now, the plaintiffs say, well, there's still some

22 ambiguity and they cite an unpublished opinion from Texas

23 called *La Joya Independent School District versus Villarreal*,

24 which even though there was a similar statement, nonetheless

25 said, well, we are going to construe a third-party

1    beneficiary here.

2        But in that case it was very, very different.  In that

3    case the specific trumped the general because there was a

4    clause in that very contract that says even though our

5    premise is that this contract is not to benefit any third

6    party, a particular broker, a real estate broker was

7    mentioned by name as a party who is intended to benefit from

8    that contract.  And obviously I think that case, that Texas

9    case, that exception actually proved the general rule which

10   is well settled.

11       The parties are essentially shifting the burden of

12   responding to requests for medical records not to create

13   third-party rights here, because under HIPAA the records are

14   going to go to the plaintiffs under any circumstance.

15   They're going to go because they're entitled to them.

16       These contracts were entered into between hospitals and

17   healthcare providers and a facilitator of medical records for

18   the express purpose of relieving the hospitals of their

19   obligation to comply with HIPAA, and in the same way that

20   there are no third-party beneficiaries when a real estate

21   assessor enters into a contract with a town to provide real

22   estate tax assessments of every home in the town, obviously

23   individuals are going to benefit from that assessment, but if

24   they are expressly excluded from the contract then they

25   don't -- then they don't have any right.

1    I'm going to let Ms. Strang talk about the voluntary

2   payment doctrine, which under *Cotton* and under your own

3   *Tri-City* case I think would dispose of the claims under the

4   contract, even if there were a viable contract because

5   everything's been paid.

6        I just want to make one other point in closing, which is

7   their contract claims also fail under *Astra versus Santa*

8   *Clara*, which is a recent 2011 Supreme Court of the United

9   States case.  As in *Astra,* the contract that the plaintiffs

10  are suing on are mandated by law and they implement federal

11  regulations here.

12       And just as in *Astra*, HHS is empowered to enforce HIPAA

13  and, as the Court said, allowing private third parties to sue

14  in this situation would, quote, "spawn a multitude of

15  dispersed and uncoordinated lawsuits."

16       In fact, in this own district we have a decision from

17  Judge Batten in a case called *McCabe versus Daimler*,

18  948 F.Supp.2d 1347, where he said at 1366:  "The Court has no

19  power to recognize what would effectively be a private right

20  of action that Congress declined to create."

21       That was a case where he made very clear in his opinion

22  that Mercedes-Benz had a fuel defect, there was a problem

23  with these vehicles, and the individuals were bringing a

24  lawsuit, and to the extent that they could actually plead a

25  true fraud case, real fraud, real reliance, real

1   misrepresentations, he said that could continue.

2       But what he said could not continue, and that's what's

3   so relevant here, is he said you can't bring your claim and

4   say under the Motor Vehicle Safety Act, like the HIPAA Act

5   here, the defendants were obligated to pay something to the

6   plaintiffs here because, as the judge ruled in that case,

7   that would simply be an end run around a no private right of

8   action.

9       So just to conclude, Your Honor, I think this case,

10  first and foremost, should be thrown out or dismissed because

11  this is all an end run around something that Congress has

12  said there's no private right of action.  They haven't

13  brought independent state law claims that would warrant

14  using, even if Georgia law were to recognize the guidepost

15  theory, which it hasn't yet recognized in any case, it

16  wouldn't warrant employing that rule from other

17  jurisdictions.  This is not even a regulation or a statute,

18  so it's even weaker than the situation that you had in the

19  *Chapman* case a couple of years ago.

20      And with respect to the contracts, they couldn't be more

21  clear that they expressly say there are no third-party

22  rights.

23      THE COURT:  With regard to your last point and your

24  issue of standing, that goes to the question of whether they

25  have claims arising under the BAAs, your contention being

1  that they're, neither party, is obviously, nor a third-party,

2  beneficiaries of those agreements.  But in terms of their

3  standing for the other state law claims, would you agree, and

4  I think you said in your brief, that there is a contract

5  between your client and the plaintiffs in terms of the

6  contracting for the providing of the records at the price at

7  which they were provided.

8      In other words, there was an agreement there and if

9  there is a cause of action that arises from that, and I'm not

10  saying there is, but if there were a cause of action that

11  arose from that relationship that they would have standing

12  with regard to that contract.

13  MR. LEFKOWITZ:  Well, there are contracts between --

14  there are not -- we don't have a contract with any of these

15  plaintiffs.  We have contracts with healthcare providers and

16  under those contracts we have obligations and the obligations

17  that we have under those contracts expressly disclaim any

18  third-party beneficiary.

19      I guess you could find, Your Honor -- I think that that

20  means they don't have standing to sue under the contract and

21  since I also don't think they have standing to bring what is

22  effectively an end run around a private right of action, I

23  don't think they have any claim to bring, but they certainly

24  can claim, for example, fraud and misrepresentation, and if

25  they could claim that we simply engaged in a fraud, that we

1    made a misrepresentation of fact, that they relied on that,

2    that would be a different story, Your Honor.

3         THE COURT:  And that's what I'm talking about.

4         MR. LEFKOWITZ:  Correct.

5         THE COURT:  I'm not talking about a claim that relies on

6    your failure to have done something you were required to do

7    under the business associate agreement, but rather an

8    obligation you had when they ordered their records or

9    whatever and you then engaged in that relationship that you

10   had with them.

11        MR. LEFKOWITZ:  Sure.  And we actually sent them an

12   invoice and there is a document that says when we send them

13   an invoice we're in effect contracting with them and if we

14   had sent them an invoice and we had made a misrepresentation

15   of fact in the invoice and then they didn't know about it and

16   they then paid, not a situation where it's a

17   misrepresentation of the law, we're not a situation like in

18   the *Shaw* case where they should have known, they were on

19   notice, but if we really made a misrepresentation of fact and

20   they relied on it that would be a different story, Your

21   Honor.

22        THE COURT:  That's my point.  In terms of distinguishing

23   the issue that you've raised in one of your motions, which is

24   a standing issue, that goes to claims arising under the BAA,

25   whereas that particular defense may not necessarily apply to

1    these other claims, while I recognize you have the other

2    defenses.

3        MR. LEFKOWITZ:  And that's a perfect segue to the

4    voluntary payment, which I think is one of the strongest.

5    Thank you, Your Honor.

6        THE COURT:  Yes, sir.

7        MS. STRANG:  Good afternoon, Your Honor.

8        THE COURT:  Good afternoon.

9        MS. STRANG:  My name is Ally Strang.  I'll be arguing

10   for dismissal of the unjust enrichment and money had and

11   received claims against Ciox.

12       I'm going to focus on two different reasons why these

13   claims should be dismissed.

14       The first is voluntary payment.  It's undisputed here

15   that plaintiffs paid the invoices that Ciox sent to them;

16   they paid in full.  So in response we've raised voluntary

17   payment.  And in Georgia that is codified at statute 13-1-13.

18       Plaintiffs say that there are two exceptions to

19   voluntary payment which apply under these allegations.  The

20   first exception that they allege is fraud.  But as has

21   already been discussed here, plaintiffs have not alleged a

22   cognizable claim for fraud.  They haven't pleaded a single

23   misrepresentation of fact and even if they had they have not

24   pleaded reliance on any misrepresentations of fact.

25       There's actually a case that's directly on point under

1    these allegations and it demonstrates that the fraud

2    exception is inapplicable here, and that's the *Cotton* case,

3    which is a Georgia Court of Appeals decision.  And in that

4    case defendants were similar to Ciox, companies that copied

5    medical records for plaintiffs.  Plaintiffs were former

6    hospital patients and they had some records copied for them.

7         After they paid they said that the defendants had

8    overcharged them based on a Georgia statute that's not at

9    issue in this case.  So in that case there were also

10   statutory overcharges.  And the plaintiffs argued that

11   voluntary payment didn't apply even though they had paid in

12   full because the copying companies, quote, "practiced an

13   artifice on them by providing the records which the hospitals

14   had a duty to provide and then billing them for excessive and

15   illegal amounts which the hospitals could not impose."

16        And the court rejected that argument and said there was

17   no fraud because, quote, "to the extent that this practice by

18   the defendants may have constituted some sort of artifice, it

19   does not appear that it in any way induced the plaintiffs

20   into making the payments they seek to recover."

21        So, in other words, just like in this case, the *Cotton*

22   plaintiffs had pleaded full knowledge of the material facts

23   and they had pleaded that they hadn't relied on any

24   misrepresentations, even if there were misrepresentations.

25        Plaintiffs' main case in response here is the *SouthStar*

1  *Energy* case.  That case is also about statutory overcharges

2  and in that case the plaintiffs also alleged fraud, just like

3  here.  And plaintiffs say just because they've alleged fraud,

4  just because they've alleged these misrepresentations, that

5  their claim should survive.

6      But *SouthStar* is distinguishable on at least two

7  grounds.  First off, in that case the defendants were natural

8  gas companies and there was a statute on point for natural

9  gas companies that required them to refund any overcharges.

10     So the court looked at the two statutes, the natural gas

11 company statute and the voluntarily payment statute, and said

12 that the more specific statute should trump the more general

13 statute, which was voluntary payment.

14     Of course, here there's no second statutory issue on

15 point that would compel that result.

16     And even moreover, the *SouthStar* plaintiffs said that

17 the misrepresentations themselves actually, quote, "prevented

18 them from discovering the alleged overcharges."

19     Here the plaintiffs themselves in their complaint have

20 pleaded that they knew about the overcharges before they paid

21 it.  So it's simply not -- it's not on all fours with our

22 case.

23     THE COURT:  So is it your position that essentially a

24 party that knows he's overcharged has a choice, his choices

25 are just do not pay or pay and lose your rights for recovery?

1    MS. STRANG:  Yes.  So for example, the plaintiffs in

2  this case could have not paid and then dealt with any

3  ramifications later on; or they could have paid, which in

4  this case they did, and in that case the voluntary payment

5  doctrine applies unless some other exception bars voluntary

6  payment.

7    THE COURT:  So even if there's collateral damage that

8  the party might suffer as a result of nonpayment through the

9  credit reports or whatever may occur, that's, under the law

10  in Georgia, those are your options?

11    MS. STRANG:  Under the law in Georgia those are your

12  options if the only collateral damage that's alleged is a

13  fear of collection action or a fear of risk of impairment of

14  credit, and that's exactly what we have alleged here.

15    And that actually again brings us back to *Cotton* because

16  plaintiffs say that they paid under an urgent and immediate

17  necessity for exactly those reasons.  But the only urgent and

18  immediate necessity that they allege is fear of collection

19  attempts.  And again we have *Cotton* that could not be clearer

20  that the risk of, quote, "collection action and impairment of

21  credit does not constitute an urgent necessity within the

22  meaning of the voluntary payment doctrine."

23    And, again, Your Honor has recognized this before in the

24  *Tri-County* case, 2011 WL 1497384.

25    THE COURT:  This is -- you know, you always worry about

1  getting a question from out of left field from the judge so

2  I'm going to warn you before I ask, here it comes.

3       MS. STRANG:  Okay.

4       THE COURT:  I'm just wondering, this is just my

5  curiosity, just how far does this go?  For example, if I were

6  requesting from your client that he get my medical records

7  because I need them for my doctor for treatment that I need

8  that could be life-changing or even end my life if I didn't

9  get it and I need this record to get it to my doctor and I've

10 got to pay to get it, and I pay even though I think you're

11 overcharging me, am I stuck then?

12      MS. STRANG:  No.  I think you wouldn't be stuck in that

13 case.  In that case you were under an urgent and immediate

14 necessity because you needed the medical records for a

15 medical procedure, at least arguably.  But in this case the

16 plaintiffs got their medical records before they paid, so the

17 medical records were not being held hostage here.

18      THE COURT:  Okay.

19      MS. STRANG:  So separate and apart from voluntary

20 payment there's another reason why the unjust enrichment and

21 money had and received claims should be dismissed and that's

22 because plaintiffs have not alleged anything unjust or

23 unlawful here except for what is based on the $6.50 ceiling.

24 And without that ceiling, which has no private right of

25 action, as has already been discussed, they haven't alleged

1    anything unjust.

2         As Mr. Lefkowitz already discussed and briefed, that the

3    Northern District of Georgia has considered a similar issue

4    in the *McCabe v. Daimler* case.  In that case the plaintiff

5    paid for some car repairs and they argued that they shouldn't

6    have had to pay for those repairs under the Motor Vehicle and

7    Safety Act, and they said because they paid for them instead

8    of defendants that defendants were unjustly enriched.  And

9    the Motor Vehicle and Safety Act, like HIPAA and like the

10   guidance, had no private right of action.

11        The Court dismissed the unjust enrichment claim because

12   the act, quote, "did not create a private right of action.

13   Plaintiffs cannot overcome that obstacle by fashioning an

14   alternative claim that is in essence a suit to enforce the

15   statute itself."

16        Unless Your Honor has any additional questions I'll

17   reserve any remaining time.

18        THE COURT:  Thank you.

19        MS. STRANG:  Thank you.

20        THE COURT:  I'll hear from the plaintiffs.

21        MR. MARTINEAU:  Good afternoon, Your Honor.

22        THE COURT:  Good afternoon.

23        MR. MARTINEAU:  Chris Martineau, and I apologize for not

24   standing up in the beginning.  But in any case I'm going to

25   try and answer or respond to defendants here.

1      The first thing I wanted to mention is the fact that we

2    are not claiming a violation of HIPAA.  Plain and simple,

3    breach of contract is the first and foremost.  And Your Honor

4    hit it right on the head, there's two potential breach of

5    contracts in play in this case.

6      The one is the invoice itself and since I can speak to

7    it right away, I will do so by saying that the contract

8    itself, defendants wanted to say that it was a contract, they

9    went to great lengths within their initial brief to indicate

10   it was a contract, and they cite to a case called *Clow*

11   *Corporation versus Metro Pipeline Company*.

12      And the reason that's important Your Honor is, number

13   one, it indicates that the invoice can be a contract; but,

14   two, within that case the court went through and discussed

15   the UCC.  And based on the terms of the UCC the contract

16   itself can be revoked, which the plaintiffs in this case did

17   when they made payment under protest and demanded their money

18   back.  Voluntary payment doctrine doesn't apply in that

19   scenario.

20      In doing so, that contract itself would be enough

21   because they admit that the contract exists.  The contract

22   itself also, the terms of that invoice don't come from HIPAA,

23   don't come from the guidance issuance from HHS, but rather it

24   comes from the BAA, the business associates agreement.

25      And within that agreement is where the terms are how

1   much they can charge and the fact that the plaintiff is --

2   that they're going to have to give the records to the

3   plaintiff, or if the consumer requests the records, and as a

4   result it is that contract, number one, that certainly is in

5   play in this case, and because Ciox was bound to provide the

6   records upon request for no more -- well, they had three

7   options, Your Honor.

8       They could have made the copies and tracked their hours

9   and then charged for that, or they could have done the flat

10  rate, which is $6.50, or they could have also contacted them

11  and said we can't do this for this amount.  There's many

12  things they could have done.

13      But the $6.50 is a benchmark to be used based on the

14  contract itself because the contract, it's the benchmark in

15  that because they chose not to do those other things in this

16  scenario, we know that the most that they can charge is

17  $6.50.

18      THE COURT:  Did you say your clients revoked the

19  contracts?

20      MR. MARTINEAU:  The invoices themselves.  They actually

21  wrote on the invoices when some of them sent them back saying

22  we don't think we owe this, we're paying under protest.  Then

23  there was demand letters sent to Ciox by all three saying we

24  want our money back, and, by the way, pay everybody else

25  back, you've charged more than you were supposed to in this

1    scenario.  So, yes, that's revocation, we want our money

2    back.

3        And under the UCC you have to revoke consent but you

4    also have to pay the reasonable value for what you received.

5    That value comes through their BAA, which says $6.50 because

6    they took no other measure to determine a value of what the

7    labor rate was, the postage and everything else.  They could

8    have itemized all that out but they didn't, which leaves them

9    at the $6.50, the max they could charge.

10        THE COURT:  It seems to me the contract has been

11   completed at that point.  Would it be more in the nature of a

12   rescission as opposed to a revocation?  Maybe it doesn't

13   matter a great deal except in a rescission you restore both

14   parties to the position where they were, which would seem to

15   suggest your client would have to return the documents to

16   them to get their money back.

17        MR. MARTINEAU:  But, Your Honor, under the UCC and under

18   the case that they had referenced it says that they have to

19   pay for what they received.  So the records they want to

20   keep, they don't want to give them back.  And so by keeping

21   it, though, they have to make good on what they received

22   pursuant to, you know, the benchmark of what they owed.

23        They sent it all because they didn't know.  And that

24   leads me to the second point.

25        When we're talking about standing, Your Honor, there

1   seems to be this notion that the plaintiffs knew that they

2   were paying more than they were supposed to.

3       First of all, there was no discussion by the defense

4   about Mr. Kuchenmeister.  Mr. Kuchenmeister himself, he never

5   sent the letter.  He received an invoice and he paid under

6   protest.  There's no knowledge pled that he knew ahead of

7   time that he needed -- that he was paying more than he was

8   supposed to.

9       Second of all, what's been left out by the defense is

10  that Ms. Hugger-Gravitt and Ms. Bretoi, after they sent the

11  initial letter saying, hey, you're charging us too much, you

12  shouldn't be charging us this amount, Ciox continued to send

13  letters or invoices saying, no, you owe us this amount.

14      So then a payment was sent for $6.50.  But here goes to

15  the practice that was continued upon the plaintiffs:  After

16  the payment was received, as pled, Ciox cashed the checks by

17  Ms. Gravitt and by Ms. Bretoi and then continued to invoice

18  continually for the additional amount.  That is a deceptive

19  practice.

20      Again, their BAA says they know that they are obligated

21  to pay -- to bill -- first of all, I should say Ciox can't

22  even touch plaintiffs' medical records without the permission

23  of the BAA, without the consent, without the contract,

24  because HIPAA says no way, you can't touch them.

25      So they have to have an agreement in place to allow them

1   to even access those records.  And once they have access

2   their contracts, which are negotiated, and that's important

3   as well, but which they negotiated is what bound them to

4   $6.50, there's no question about that.

5       It's just because there's not a direct contract between

6   the two that they want to argue that, you know, we're trying

7   to argue HIPAA and everything else, but that's just the

8   benchmark.

9       So towards their fraud and negligent misrepresentation,

10  and even more importantly towards the Fair Claims Business

11  Practices Act, there has been pled by all three plaintiffs

12  the practice of continuing to assert, and they said there's

13  no facts that have been asserted.

14      Well, every time they sent an invoice that's incorrect

15  for the amount they know they're allowed to charged under

16  their BAA, that's a fraudulent or deceptive practice to

17  assert money they're not owed, especially when they're paid

18  $6.50 and they kept telling the plaintiffs you need to pay

19  this.

20      And there's been an example in the complaint that was

21  provided, Your Honor, and it's a collection letter to

22  Ms. Bretoi and it says in there that if you don't pay this,

23  it says if you don't pay this, we're at our last attempt,

24  we're going to send it to collections.

25      So they want to argue that, you know, there's no dire

1  need, there's no reason to worry about it.  But we know

2  credit in America right now is a big deal.  Equifax is one

3  prime example that if your credit is messed up for whatever

4  reason, that's important for people to get jobs, to get

5  housing, whatever.  And it's more important now than it ever

6  has been.  And when somebody knows that if they don't pay the

7  full bill and you're being told if you don't pay it's going

8  to collections, you're going to pay the bill and you're going

9  to ask for the money back.

10      Under the Georgia Fair Claims Business Practices Act

11  there's this notion I just wanted to hammer home again that

12  Ciox is claiming that they're regulated by HHS.  And to some

13  extent they are.  But for this purpose, for purposes of what

14  they can charge a consumer when they request their personal

15  health information, they are not regulated.

16      In fact, their brief, and I don't have the page, Your

17  Honor, but their own -- their reply brief indicates that you

18  shouldn't take our word for it, plaintiffs' word that they're

19  not regulated, but in the footnote on the same page they say

20  we're not conceding that we are, we don't agree that we are

21  and, oh, by the way, their Exhibit A to their motion goes

22  through and talks about how HHS is only regulating the

23  covered entity.

24      And then if you look at their actual business -- the

25  BAAs, within the BAAs themselves they say we're going to take

1 on the obligations that you, medical provider, are obligated

2 to take on pursuant to the privacy rule, and, oh, if we mess

3 up on that we agree to hold you harmless and indemnify you

4 for that.

5      So they take on the responsibility but it's because of

6 the contract that they have, they take on that responsibility

7 and they won't admit or concede that they are not governed by

8 HHS.

9      So the fact is their argument about being regulated or

10 being a regulated component here, that's not the case.  And

11 because we have alleged fraud in great detail, deceptive

12 practices in detail, that claim should stand as well.

13      THE COURT:  In fairness, aren't you arguing it both ways

14 too, though?  I mean, you're arguing that the Fair Business

15 Practices Act applies to them because they're not regulated,

16 but they're bound by the regulation that says they only

17 charge $6.50 so they are regulated.  And I realize you say

18 that comes through the contract but I mean it is only there

19 because of the regulation, it seems.  Or not a regulation,

20 I'm sorry, it was a Q and A, whatever it was.

21      MR. MARTINEAU:  And I appreciate the answer, Your

22 Honor -- or the question, Your Honor.  It's not that I'm

23 trying to have it both ways.  The contract itself that they

24 negotiated for is what brings them under the obligation to

25 only charge $6.50.

1    THE COURT:  But if it's purely contractual, then -- and

2    I really want to get at this because this is troublesome to

3    me from your position in the case.  If you don't have

4    something other than the contract to hang your hat on, it

5    gets really dicey for you because it clearly provides there

6    are no third-party beneficiaries under the -- or it seems to

7    me it does on my first reading, and you may convince me

8    otherwise, but I'm just saying it's a pretty strong case

9    there are no third-party beneficiaries under these BAAs, and

10   if that's the case then that becomes problematic.  And that's

11   why I was asking counsel for defendants about this

12   independent silo over here, that is the claims you have based

13   on the contractual relationship you have with the party

14   outside of this contract.  So I think that having to rely on

15   the contract, the BAA contract, is tough for the plaintiffs

16   here.

17       MR. MARTINEAU:  One, that's also why we have the

18   equitable relief claims in the case.  But, two, other than to

19   say the BAA itself -- I'll back up.

20       The privacy rules gave the sample contract, okay, and

21   within that there's been some discussion on whether or not

22   the plaintiffs were intended -- I'm kind of starting to go

23   into the intended beneficiary stuff, but the contracts

24   themselves, Health and Human Services gave a sample contract

25   and when they did so they said the one basic clause that has

1    to be in there is that you agree that you're going to comply

2    with the requirements for charging a consumer.

3        Other than to say that because they put it into the

4    agreement itself and the fact that within their own, if you

5    look at their own BAAs, there are two clauses that -- I know

6    Your Honor said you think that it's pretty clear that there's

7    no third-party beneficiary, but the one particular clause

8    itself actually comes out and says unless otherwise stated

9    within the agreement itself.  And if you look at the first

10   opening, and we've cited to it, but if you look at the first

11   opening part of the BAA it references how we're going to do

12   things based on the privacy rule.  And we've cited to the

13   fact that the privacy rule is intended for the consumer so

14   they can obtain a personal copy of their personal health

15   information.

16       Before I forget, Your Honor, I did want to put an

17   objection on the record also for citations that have been put

18   forth to this Court that have not been previously briefed.

19   We believe there might have been some of those, we can't find

20   them within the briefs themselves.  Number one, put an

21   objection on the record; but, two, we would like an

22   opportunity to respond if the Court so desires.

23       Concerning the *Astra* citation that you were referred to

24   where HHS had a direct contract with the medical -- the

25   Medicare medical providers, I think it was for medication,

1  it's distinguishable because, one, it had a direct contract

2  with the provider themselves and there was a boilerplate

3  contract, it was reciting the statute itself.  There was no

4  ability to negotiate a contract whatsoever.  In this case

5  Ciox doesn't have a direct contract with HHS.

6       They also had an opportunity, and they did because we

7  see three different examples of their associate agreements,

8  they negotiated those contracts.  So this is not the case.

9  So this is distinguishable, it's a government with a

10 government contract.  This is not that case.

11      Your Honor, I think I'm going to reserve the rest of my

12 time.

13      THE COURT:  I have another question but I wanted to make

14 sure you covered what you wanted to cover.

15      MR. MARTINEAU:  I think I have, Your Honor.

16      THE COURT:  Okay.  Going again to the area I was talking

17 about a moment ago in terms of the relationship that arises

18 between your clients and the defendants based upon their

19 requests for records and the providing of those records and

20 the billing for those records, I understand enough about the

21 facts shown me to give me the factual bases for the claims,

22 but based upon that relationship what causes of action are

23 you asserting?  I assume there's fraud.

24      MR. MARTINEAU:  Correct.

25      THE COURT:  Any others?

1          MR. MARTINEAU:  Okay.  So --

2          THE COURT:  Unjust enrichment, I guess, and fraud.

3          MR. MARTINEAU:  Yeah.  I guess, Your Honor, I didn't

4   follow and I apologize, I didn't follow what you were saying.

5   Could you repeat that?

6          THE COURT:  Sure, happy to.  In terms of the

7   relationship that exists between your clients and the

8   defendants that arises out of their having -- and I use the

9   term perhaps loosely but I think everyone is using it now --

10  contracted to get their records through the defendants and

11  pay the defendants for those records, that was the

12  arrangement there, arising out of that relationship, what

13  state law claims are you asserting?  As I said, I clearly

14  understand that you're asserting there's fraud on the part of

15  the defendants towards your clients, perhaps unjust

16  enrichment.  Are there other state law claims?

17         MR. MARTINEAU:  Negligent misrepresentation.

18         THE COURT:  Okay.

19         MR. MARTINEAU:  We're doing the Fraud Business Claims

20  Act.  And then we have the contract claims as well.  So I

21  mean, there's two potential contract claims there.

22         THE COURT:  You're right, okay.  So there's also, aside

23  from the assistant or the associate agreement, the contract

24  that we are talking about, this direct contract between you

25  and the parties, you're also alleging a breach of that

1    contract?

2        MR. MARTINEAU:  Yeah, based on what we talked about,

3    Your Honor.

4        THE COURT:  All right, thank you.

5        MR. MARTINEAU:  Thank you.

6        THE COURT:  Anything?

7        MR. LEFKOWITZ:  Sure, Your Honor, thank you.  I'll try

8    to be brief.  I just want to respond to four or five points

9    very briefly in no particular order.

10       You had raised the question earlier with Ms. Strang

11   about, you know, urgent necessity and the like, and I just

12   wanted to let you know there is actually a regulation that

13   requires companies like ours to provide the records within 30

14   days under any circumstance.  But obviously I think the

15   hypothetical you suggested might create an urgent necessity,

16   as Ms. Strang said, of the sort that is not here.

17       THE COURT:  So even if they don't pay you've got to get

18   it to them in 30 days?

19       MR. LEFKOWITZ:  Correct, under any circumstance we have

20   to do that.

21       THE COURT:  Okay.

22       MR. LEFKOWITZ:  Now, you know, they made this argument

23   about, well, they filed a protest and O.C.G.A. Section

24   13-1-13 says filing a protest at the time of payment does not

25   change the voluntary payment doctrine.

1    So just filing a protest is not sufficient.  There has

2  to be an excuse.  And as Your Honor made clear in the

3  *Tri-City Towing* case citing *Cotton*, to avoid allegations,

4  quote, "of bad faith and to prevent damages to plaintiff's

5  credit rating is insufficient to rise to the level of urgent

6  and immediate necessity as required by Georgia law."

7    And just as a point of fact, and this is in the exhibits

8  to the complaint, the collection letter was actually sent to

9  Plaintiff Bretoi on October 23rd.  A week earlier Bretoi

10  wrote her check.  So the check was actually written even

11  before the collection letter was received.

12    Now I want to get to I think what is really the heart of

13  the question that you've been asking which is, okay, are both

14  sides here trying to have it both ways, sometimes there's a

15  contract, sometimes there isn't a contract, and so I want to

16  be very clear.

17    There is a contract that we have with the BAAs but it

18  couldn't be more clear that they are not a third-party

19  beneficiary.  And while it is certainly true that there is a

20  reference to notwithstanding any other agreement, Section 1,

21  I'm just reading from the Allina BAA, says, quote, "In the

22  event of any conflict between the provisions of the BAA and

23  the provisions of any other agreements between the parties,

24  the provisions of the BAA control."

25    And the BAA is the contract that specifically says there

1   is no third-party beneficiary.  So, yes, we do have a

2   contract.  They are not beneficiaries.

3       Now, there is a contract that we have with them; it's a

4   very limited contract.  And the case that we cited, *Clow*,

5   makes very clear, you send a purchase order along with an

6   invoice and the terms and conditions are attached, that's the

7   contract.  And if they pay what we hold out is the required

8   amount, that's the contract.

9       So there is a contract.  We certainly haven't breached

10   the contract, we told them what they owed us; they paid it.

11   And they paid it so there's a voluntary payment issue.  And

12   under both Georgia and Minnesota law neither an unjust

13   enrichment claim nor a money had and received claim can

14   survive if there is a legal contract.  So they actually don't

15   have an unjust enrichment claim with respect to that

16   contract.

17       Now, you said but there is a contract between us and the

18   plaintiffs, and so then the question is why didn't we violate

19   it?  And they keep falling back to show why we violated it on

20   the $6.50.

21       So again, even in the narrow contract that we

22   acknowledge we have, the way they say we're violating it is

23   to import this FAQ guidance from HHS from HIPAA and bring

24   that into the contract, but that wasn't part of our contract

25   at all.

1    They simply can't get around the fact that everything

2   that relates to the $6.50 statement, which they build into a

3   requirement, although it's not -- in my view it's not a

4   requirement because Georgia courts have held that it's not a

5   requirement and it's not actionable, but even if it were it

6   would be barred because there's no private right of action to

7   go after that and it was not encompassed in our limited

8   contract with them.

9    I think the last point, Your Honor, that I want to make

10   is they have one remaining claim that I guess they could

11   still plead or try to plead, which is their fraud claim.  But

12   fraud requires justifiable reliance and a misrepresentation

13   of fact.  And they don't allege, and they're the master of

14   the complaint, they don't allege a misrepresentation of fact

15   and they don't allege anything that says they relied on it

16   because their own conduct demonstrates, with all of these

17   letters and all of these protests, that they believed that

18   they were on full notice that what we were doing was

19   inappropriate.

20    Now, we take significant issue with the merits of that

21   contention, obviously, but from the perspective of reliance

22   they couldn't claim to have been misled by any fact.  They

23   have a beef, an argument with our billing them whatever we

24   billed them, which they paid, and their beef is they say we

25   violated federal law.  That's not a misrepresentation of a

1    fact and there's no reliance.

2        So I don't think with respect to their fraud claim that

3    it is cognizable as a Rule 12(6).

4        THE COURT:  I've tried to look through the business

5    associate agreements for this and it may be there and I

6    didn't pick it up, is there a provision in the business

7    associate agreements that sets the price?

8        MR. LEFKOWITZ:  Your Honor, there is no set price.

9    There are provisions in our agreement with the BAAs, in our

10   BAA agreements with the providers that say we have to comply

11   with federal law.  Obviously, federal law, we have a

12   difference of opinion, obviously, about what the statute

13   requires or what any of the regulations require.  There are

14   regulations that do require a reasonable fee and you can

15   charge your cost or you can charge otherwise a reasonable

16   fee.  They're not bringing claims, though, for that; they're

17   bringing claims that are pegged to this $6.50 guidance.

18       THE COURT:  I understand and I understand where that

19   comes from, that's what I was looking for, the provisions

20   here.  I had assumed there were provisions but I had not

21   found any that were stated in terms of specificity in terms

22   of a stated amount.

23       MR. LEFKOWITZ:  There is none.  It's just like the

24   Supreme Court case in *Astra* where the agreement requires

25   conformity with federal law and that's our agreement here and

1    it's for the same reason that in the *McCabe versus Daimler*

2    case the court found that plaintiffs couldn't bring their own

3    case to try to enforce that.

4    THE COURT:  Thank you.

5    MR. LEFKOWITZ:  Thank you, Your Honor.

6    THE COURT:  One last shot.

7    MR. MARTINEAU:  I do, thank you, Your Honor.

8    First of all, so that the Court has the records, it's

9    page -- it's Exhibit 19-2, the terms are spelled out for each

10    contract.  That first one is page 28, second one is page 53,

11    and the third one is page 69.  All reference the privacy rule

12    or actual statute for the privacy rule itself.  And this,

13    again, is unlike *Astra* in that the only reason that's in the

14    contract and it says that is because that was what was

15    required by HHS when they gave their sample contracts, said

16    need to have a term that says you are going to abide by these

17    rules if your business associate is going to touch those

18    records, period.

19    Voluntary payment doctrine, we've alleged fraud,

20    deceptive practice, it's an exception.  I don't need to get

21    back into that but I wanted to reaffirm that.  And the fact

22    that the collection letter came after she sent her payment,

23    it still came, it was still going to happen.

24    Let's see, the unjust enrichment count, Your Honor, we

25    still have the first potential contract we're talking about,

1   so even if we have a second contract, there might be two in

2   play, that claim still survives based on the first contract

3   claim that we're bringing.

4        And one of the things they keep talking about is the

5   guidance and whether or not it's authoritative or not, and

6   within their own brief, Your Honor, I think it's their

7   reply -- no, it's the initial brief, I believe when it comes

8   to -- I've got to find it.

9        THE COURT:  Standing or the other one?

10       MR. MARTINEAU:  Standing, I believe, I think it's page

11  5.  No, it's page -- it's Document 19, Your Honor, so it's

12  the standing.

13       Defendant went to great lengths to talk about HIPAA,

14  privacy rule.  Then they started talking about how HHS

15  started implementing these rules, didn't give them an

16  opportunity to respond.  But then on page 7 they use words

17  like HHS access guidance is "forced" covered entities,

18  "mandated" that they do this stuff, they use "required."

19  Their own -- in fact, their Exhibit A is to HHS disputing all

20  of what they've been trying to dispute under the $6.50 for

21  covered entities that have to pay that, yet they acknowledge

22  in their own brief that this access guidance is what they

23  must follow, what the covered entities have to follow.  And

24  using strong words like that, it makes it pretty clear they

25  have no option but to follow that.

1      THE COURT:  And what is your position as to where the

2  6.50 is stated?  In what document is that?

3      MR. MARTINEAU:  It's part of the privacy rule itself.

4  Well, it's not stated in the privacy rule.  It says a

5  reasonable fee, which is why we also said it's just kind of a

6  benchmark for the plaintiffs in this case, because they had

7  three options to determine what the reasonable fee was.  But

8  these plaintiffs, the options that they could have done Ciox

9  did not do.  And since they didn't do that, then based on the

10  privacy rules themselves and based on the guidance that has

11  been put forth by HHS in which they acknowledge in their own

12  briefing that is basically the law here that they have to

13  abide by, the most they can charge was $6.50.

14      THE COURT:  And that's in what -- I mean, is it in a

15  guidance issued by the agency?  Is it in a regulation that

16  came after notice and comment?  If I wanted to look it up

17  where --

18      MR. MARTINEAU:  Well, it's in two places.  For purposes

19  for you, Your Honor, it's in the guidance, number one, and

20  that was attached to the complaint and you have it before

21  you.

22      But, two, in the complaint as well one of the covered

23  entities that defendants had been providing records for was

24  actually sanctioned because they charged more than $6.50.

25  You have the letter as part of the complaint and as part of

1    that, it was, I believe, Healthport, who at the time was the

2    service provider or the business associate, but that also

3    informed them that the most they could charge was $6.50 and

4    they had to change their contracts as a result of that

5    enforcement action that was taken by HHS.

6         THE COURT:  Thank you.

7         MR. MARTINEAU:  I just wanted to make sure I had nothing

8    further.

9         THE COURT:  Okay.

10        (Pause in the proceedings.)

11        MR. MARTINEAU:  I just want to drive home, Your Honor,

12   that they keep talking about how the plaintiffs knew, the

13   plaintiffs knew and they paid.  That takes away from the

14   deceptive practice.  But the one thing they don't want to

15   talk about is Mr. Kuchenmeister himself.  He paid.  He didn't

16   send letters, he paid under protest, period.  They have no

17   information before this Court whether or not he knew or not.

18   That alone requires further discovery, what his knowledge was

19   and what his rights were.  But even if he did, he has a right

20   to pay under protest and he did and there's deceptive

21   practice, so we get beyond the voluntary payment doctrine.

22        THE COURT:  Thank you.

23        MR. MARTINEAU:  Thank you, Your Honor.

24        THE COURT:  I'll let you briefly respond since we opened

25   a new little area there.

1      MR. LEFKOWITZ:  Sure, Your Honor, and I just want to

2  clarify two things.

3      First of all, counsel read from our brief at page 7

4  where we describe the DHHS access guidance and we then say in

5  the immediate succeeding sentence, which counsel didn't

6  quote:  "Following the issuance of these new rules by DHHS,

7  members of both houses of Congress, along with Ciox,

8  questioned the enforceability and advisability of the new

9  access guidance."

10      So by no means have we in any way acknowledged that

11  these guidances, which have not gone through any notice and

12  comment rule-making, are legitimate, and indeed I think we

13  would challenge in the appropriate court if HHS were to try

14  to enforce them.

15      I also want to point out that the example that counsel

16  gave of the 6.50 predated the access guidance.  It's actually

17  from a 2014, so it predated letters, it's an enforcement

18  action, and at that time it refers to 6.50 as part of a

19  settlement.  In order to resolve the matter, OCR provided

20  assistance and they've come up with an agreement at $6.50.

21      So that's actually part of the origin of this $6.50,

22  which then went into not a formal rule-making but simply this

23  FAQ on the HHS website, which obviously now people are trying

24  to turn into something more powerful than that and we've got

25  significant concerns about the legitimacy.

1    All of this goes really just to be directly responsive,

2   I won't belabor any of the other arguments.

3    THE COURT:  Thank you.

4    MR. LEFKOWITZ:  Thank you, Your Honor.

5    THE COURT:  Thanks to all of you for your arguments.

6   This is an area that is complex and so it's helpful to get

7   insights from counsel who are familiar with it, so thank you

8   for your presentations.

9    MR. KEOGH:  I have one question, Your Honor, I

10  apologize.  As counsel mentioned this *Cotton* case that they

11  say is controlling that both counsel used, we can't find it

12  in their briefs and if they have, I apologize, but if they

13  have not I would like to supplement.  We might have missed

14  it.

15   MS. STRANG:  It is cited in our reply to the 12(b)(6)

16  motion at page 3.

17   MR. KEOGH:  Well, then there you go.

18   THE COURT:  Okay, thank you.

19   (Proceedings concluded at 3:10 p.m.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT:

5    NORTHERN DISTRICT OF GEORGIA:

6

7              I hereby certify that the foregoing pages, 1

8    through 43, are a true and correct copy of the proceedings in

9    the case aforesaid.

10             This the 28th day of November, 2017.

11

12

                          /s/ *Amanda Lohnaas*
13             ────────────────────────────────────

14                        Amanda Lohnaas, CCR-B-580, RMR, CRR
                          Official Court Reporter
15                        United States District Court

16

17

18

19

20

21

22

23

24

25